**Bobby Joe JOYCE, Timothy E. Smith, Thomas O'Halloran and Jim Tullah, Plaintiffs,**

v.

**CITY AND COUNTY OF SAN FRANCISCO, Defendant.**

**No. C–93–4149 DLJ.**

United States District Court, N.D. California.

March 15, 1994.

Bradley S. Phillips, Stephen M. Kristovich, Jeffrey L. Bleich, and Martin D. Bern, of Munger, Tolles & Olson, San Francisco, CA and Marcia Rosen, and Diane T. Chin, of the Lawyers' Committee for Civil Rights of the San Francisco Bay Area, appeared on behalf of plaintiffs.

Linda M. Ross, and Dennis Aftergut, of the San Francisco City Attorneys' Office and Donald J. Putterman, of Farella, Braun & Martel and Henry J. Escher III of Howard, Rice, Nemerovski, Canady, Robertson & Falk, San Francisco, appeared on behalf of defendant.

## ORDER

JENSEN, District Judge.

Plaintiffs to this action seek preliminary injunctive relief on behalf of themselves and a class of homeless individuals alleged to be adversely affected by the City and County of San Francisco's (the "City's") "Matrix Program." While encompassing a wide range of services to the City's homeless, the Program simultaneously contemplates a rigorous law enforcement component aimed at those violations of state and municipal law which arguably are committed predominantly by the

homeless. Plaintiffs endorse much of the Program, challenging it not in its entirety, but only insofar as it specifically penalizes certain "life sustaining activities" engaged in by the homeless. Plaintiffs' Proposed Order Granting Mot. for Prel.Inj. at 2.

On February 23, 1994, counsel appeared before the Court at a hearing of plaintiffs' motion for preliminary injunctive relief. Appearing for plaintiffs were Bradley S. Phillips, Stephen M. Kristovich, Jeffrey L. Bleich and Martin D. Bern of Munger, Tolles & Olson, and Marcia Rosen and Diane T. Chin of the Lawyer's Committee for Civil Rights of the San Francisco Bay Area. The City was represented by Linda M. Ross and Dennis Aftergut of the San Francisco City Attorneys' Office, and Donald J. Putterman of Farella, Braun & Martel. Having considered the arguments of counsel and the papers submitted, the Court hereby denies the requested injunction.

I. *Factual Background and Procedural History*

A. *Law Enforcement Measures as Part of the Matrix Program*

Institution of the Matrix Program followed the issuance of a report in April of 1992 by the San Francisco Mayor's Office of Economic Planning and Development, which attributed to homelessness a $173 million drain on sales in the City. Plaintiffs' Mot. at 8 & n. 6. In August of 1993, the City announced commencement of the Matrix Program, and the San Francisco Police Department began stringently enforcing a number of criminal laws. Plaintiffs' Mot. at 7.

The City describes the Program as "initiated to address citizen complaints about a broad range of offenses occurring on the streets and in parks and neighborhoods.... [The Matrix Program is] a directed effort to end street crimes of all kinds." City's Opp'n at 6.

> The program addresses offenses including public drinking and inebriation, obstruction of sidewalks, lodging, camping or sleeping in public parks, littering, public urination and defecation, aggressive panhandling, dumping of refuse, graffiti, vandalism, street prostitution, and street sales of narcotics, among others.

*Id.*

An illustration of the enforcement efforts characteristic of the Program can be found in a four-page intra-departmental memorandum addressed to the Police Department's Southern Station Personnel. That memorandum, dated August 10, 1993 and signed by acting Police Captain Barry Johnson, defines "Quality of Life" violations and establishes a concomitant enforcement policy. *See* Plaintiffs' Mot. at 8; Rosen Decl., Exh. 7. Condemning a "type of behavior [which] tends to make San Francisco a less desirable place in which to live, work or visit", the memorandum directs the vigorous enforcement of eighteen specified code sections, including prohibitions against trespassing, public inebriation, urinating or defecating in public, removal and possession of shopping carts, solicitation on or near a highway, erection of tents or structures in parks, obstruction and aggressive panhandling. Rosen Decl., Exh. 7 at 2.

Pursuant to the memorandum,

> All station personnel shall, when not otherwise engaged, pay special attention and enforce observed "Quality of Life" violations.... One Officer ... shall, daily, be assigned specifically to enforce all "Quality of Life" violations....
>
> Officers are to stop and advise all individuals pushing shopping carts that said carts are the property of local stores (Grocery/Drug etc.) and that these carts are never sold: Therefore the carts will, *in the near future,* be confiscated for return to their rightful owner or otherwise disposed of by the police.... Note: This phase of the "Quality of Life" operation will be implemented when appropriate containers, for the contents of the shopping carts, are available....

*Id.* at 2–3 (emphasis in original).

In a Police Department Bulletin entitled "Update on Matrix Quality of Life Program," dated September 17, 1993, Deputy Chief Thomas Petrini paraphrased General Order D–6, the source of the intended non-discriminatory policy of the Program's enforcement measures:

All persons have the right to use the public streets and places so long as they are not engaged in specific criminal activity. Factors such as race, sex, sexual preference, age, dress, unusual or disheveled or impoverished appearance do not alone justify enforcement action. Nor can generalized complaints by residents or merchants or others justify detention of any person absent such individualized suspicion.

Petrini Decl., Exh. A at 1–2. The memorandum stated that the "[r]ights of the homeless must be preserved", and included as an attachment a Department Bulletin on "Rights of the Homeless", which stated that:

[All members of the Department] are obligated to treat all persons equally, regardless of their economic or living conditions. The homeless enjoy the same legal and individual rights afforded to others. Members shall at all times respect these rights....

Petrini Decl. at ¶ 2.

The Police Department has, during the pendency of the Matrix Program, conducted continuing education for officers regarding non-discriminatory enforcement of the Program. City's Opp'n at 8. When, in mid-August of 1993, concerns were raised by interests outside the Department about proper enforcement of the ordinances prohibiting lodging and sleeping in public parks, the Department issued a clarification of its policies. See id.; Petrini Decl. at ¶ 3, Exh. B. Again, in mid-November of 1993, inquiries were made of the Police Department concerning the confiscation of grocery store shopping carts. See City's Opp'n at 8; Petrini Decl. at ¶ 5. Police Chief Anthony Ribera responded with the issuance of a Department Bulletin establishing topical guidelines. See Petrini Decl. at Exh. D.

Since implementation of the Matrix Program, the City estimates that "[a]ccording to unverified statistics kept by the Department", City's Opp'n at 6, approximately sixty percent of enforcement actions have involved public inebriation and public drinking, and that other "significant categories" include felony arrests for narcotics and other offenses, and arrests for street sales without a permit. Id. at 7.

Together, enforcement actions concerning camping in the park ..., sleeping in the park during prohibited hours ..., and lodging ... have constituted only approximately 10% of the total.

City's Opp'n at 7.

Plaintiffs, pointing to the discretion inherent in policing the law enforcement measures of the Matrix Program, allege certain actions taken by police to be "calculated to punish the homeless." Plaintiffs' Mot. at 9. As a general practice, the Program is depicted by plaintiffs as "target[ing] hundreds of homeless persons who are guilty of nothing more than sitting on a park bench or on the ground with their possessions, or lying or sleeping on the ground covered by or on top of a blanket or cardboard carton." Id. at 20. On one specific occasion, according to plaintiffs, police "cited and detained more than a dozen homeless people, and confiscated and destroyed their possessions, leaving them without medication, blankets or belongings to cope with the winter cold." Plaintiffs' Mot. at 9; T. Smith Decl. at ¶¶ 5–10; Homeless Decls. at 13, 56, 96.

### B. Non–Punitive Aspects of the Matrix Program

The City contests the depiction of Matrix as a singularly focused, punitive effort designed to move "an untidy problem out of sight and out of mind." City's Opp'n at 1. Instead, the City characterizes the Matrix Program as "an interdepartmental effort ... [utilizing] social workers and health workers ... [and] offering shelter, medical care, information about services and general assistance. Many of those on the street refuse those services, as is their right; but Matrix makes the choice available." City's Opp'n at 1.

The operation of the Matrix Program involves the Department of Social Services, the Department of Public Health, the Police Department and the Department of Public Works. City's Opp'n at 2–3. The City claims it has attempted to conjoin its law enforcement efforts with referrals to social service agencies. City's Opp'n at 8. One specific element of the Program seeks to

familiarize the homeless with those services and programs available to them. City's Opp'n at 5. This is accomplished by the dispersal of Department of Social Service social workers throughout the City in order to contact homeless persons. *Id.*

Another element of the Matrix Program—the Night Shelter Referral Program—attempts to provide temporary housing to those not participating in the longer-term housing program. This effort was begun in December of 1993, and is designed to offer the option of shelter accommodations to those homeless individuals in violation of code sections pertaining to lodging, camping in public parks and sleeping in parks during prohibited hours. *Id.* at 5-6. The Night Referral Program operates by referring women to a women's shelter at St. Paulus, and by offering to men transportation and a referral slip to the Salvation Army Lifeboat Lodge; both shelters are located within the San Francisco area. By prior arrangement, the Lodge agreed to set aside a certain number of beds for those referred individuals. *Id.* at 6. The City contends that, of 3,820 referral slips offered to men, only 1,866 were taken, and only 678 actually utilized to obtain a shelter bed reserved for Police referrals. By the City's reckoning, "[t]hese statistics suggest that some homeless men may prefer to sleep outdoors rather than in a shelter." *Id.*

### C. The City's Efforts in Dealing With Homelessness

The City emphasizes its history as one of the largest public providers of assistance to the homeless in the State, asserting that "individuals on general assistance in San Francisco are eligible for larger monthly grants than are available almost anywhere else in California." City's Opp'n at 1. Homeless persons within the City are entitled to a maximum general assistance of $345 per month—an amount exceeding the grant provided by any of the surrounding counties. *Id.* at 4. General assistance recipients are also eligible for up to $109 per month in food stamps. *Id.* According to the City, some 15,000 City residents are on general assis-

tance, of whom 3,000 claim to be homeless. *Id.* at 4 n. 1.

The City's Department of Social Services encourages participation in a Modified Payments Program offered by the Tenderloin Housing Clinic. *Id.* at 4. Through this program, a recipient's general assistance check is paid to the Clinic, which in turn pays the recipient's rent and remits the balance to the recipient. The Clinic then negotiates with landlords of residential hotels to accept general assistance recipients at rents not exceeding $280 per month. *Id.* at 5.

By its own estimate, the City will spend $46.4 million for services to the homeless for 1993–94. *Id.* at 1, 4. Of that amount, over $8 million is specifically earmarked to provide housing, and is spent primarily on emergency shelter beds for adults, families, battered women and youths. *Id.* at 4. An additional $12 million in general assistance grants is provided to those describing themselves as homeless, and free health care is provided by the City to the homeless at a cost of approximately $3 million. *Id.*

### D. Enforcement and Effects of the Matrix Program

The City contends that "few of the Matrix-related offenses involve arrest." City's Opp'n at 7. Those persons found publicly inebriated, according to the City, are taken to the City's detoxification center or district stations until sober. *Id.* "Most of the other violations result in an admonishment or a citation." *Id.*

Since its implementation, the Matrix Program has resulted in the issuance of over 3,000 citations to homeless persons. Plaintiffs' Mot. at 8. Plaintiffs contend these citations have resulted in a cost to the City of over $500,000. *Id.* Citations issued for encampment and sleeping infractions are in the amount of $76, according to Alissa Riker, Director of the Supervised Citation Release Program ("SCRP") with the Center for Juvenile and Criminal Justice. *See* Riker Decl. at ¶ 1. Those cited must pay or contest the citation within twenty-one days; failure to do so results in a $180 warrant for the individual's arrest, which is issued approximately two months after citation of the infraction. *Id.* at

¶ 3. Upon the accrual of $1,000 in warrants, which equates roughly to the receipt of six citations, an individual becomes ineligible for citation release and may be placed in custody. *Id.* The typical practice, however, is that those arrested for Matrix-related offenses are released on their own recognizance or with "credit for time served" on the day following arrest.[1] Plaintiffs characterize the system as one in which "homeless people are cycled through the criminal justice system and released to continue their lives in the same manner, except now doing so as 'criminals'." Plaintiffs' Mot. at 9.

According to plaintiffs, the City has conceded the inadequacy of shelter for its homeless. Plaintiffs' Mot. at 9. Plaintiffs have cited as supporting evidence an application made to the State Department of Housing and Community Development in which the City's Director of Homeless Services described an "emergency situation" created by the closure of the Transbay Terminal, which had served as "the largest de facto shelter for homeless individuals." Plaintiffs' Mot. at 9.

Plaintiffs have proffered estimates as to the number of homeless individuals unable to find nightly housing. Plaintiffs cite to a survey conducted by Independent Housing Services, a non-profit agency which among its aims seeks the improvement of access to affordable housing for the homeless. *See* Plaintiffs' Mot. at 10; Park Decl. at ¶ 2. Begun in July of 1990 and conducted most recently in August of 1993, Park Decl. at ¶¶ 4, 6, the survey tracks the number of homeless individuals turned away each night from shelters in the San Francisco area due to a lack of available bed space. Based on the data of that survey, plaintiffs contend that from January to July of 1993, an average of 500 homeless persons was turned away nightly from homeless shelters. Plaintiffs' Mot. at 10. That number, according to plaintiffs, increased to 600 upon the closing of the Transbay Terminal. Plaintiffs' Mot. at 10.

### E. *Plaintiffs to the Present Action*

The named plaintiffs to this action have been exposed differently to the enforcement of the Matrix Program and to the rigors of a life of homelessness. Plaintiffs assert they are "homeless" individuals since they lack a "fixed, regular, and adequate nighttime residence."[2] Plaintiffs' Mot. at 2. Conversely, the City contests the extent to which each plaintiff is actually homeless, citing the following evidence:

Plaintiff O'Halloran testified that his daughter invited him to live with her, but that he declined because he feels she cannot afford to shelter him. City's Opp'n at 14; O'Halloran Dep., Putterman Decl., Exh. A at 37:8–39:7. O'Halloran has also had housing available to him through the Tenderloin Housing Clinic, but found it unsatisfactory. City's Opp'n at 15; O'Halloran Dep., Putterman Decl., Exh. A at 82:5–85:25; 87:18–89:13. Though willing to share an apartment with a roommate, he claims none of his acquaintances is "suitable." *Id.* at 86:7–87:17. Finally, O'Halloran claims he refuses to sleep at a drop-in shelter. "These people that you're laying next to, they're not saints. They're all homeless...." *Id.* at 121:21–122:23.

Plaintiff Joyce receives general assistance payments from the City and presently has

---

**1.** According to Riker, seventeen homeless persons were held in custody as a result of high bail amounts accruing from Matrix-identified infraction warrants. Riker Decl. at ¶ 4. In each instance, the individual was released after being sentenced to "credit for time served." *Id.*

**2.** This definition is borrowed from Congressional legislation commonly referred to as the Stewart B. McKinney Homeless Assistance Act. *See* 42 U.S.C. § 11301 *et seq.* The Act defines a "homeless individual" to include:

    (1) an individual who lacks a fixed, regular, and adequate nighttime residence; and

    (2) an individual who has a primary nighttime residence that is—
        (A) a supervised publicly or privately operated shelter designed to provide temporary living accommodations (including welfare hotels, congregate shelters, and transitional housing for the mentally ill);
        (B) an institution that provides a temporary residence for individuals intended to be institutionalized; or
        (C) a public or private place not designated for, or ordinarily used as, a regular sleeping accommodation for human beings.

housing through the Tenderloin Housing Clinic. Joyce Dep., Putterman Decl., Exh. B at 80:21–25, 55:3–6. According to the City, Joyce "is not on the streets now, and was not on the streets when the Complaint was filed.... In fact, even when he did not receive automatic [general assistance] payments, he was on the streets for at most a few nights." City's Opp'n at 15; Joyce Dep., Putterman Decl., Exh. B at 54:5–60:12, 69:3–70:1, 72:5–75:20, 79:2–80:11.

Plaintiff Smith currently has housing, and receives general assistance and food stamps. City's Opp'n at 15; Smith Dep., Putterman Decl., Exh. D at 7:2–8, 49:17–51:22.

Plaintiff Tullah, a disabled veteran who is confined to a wheelchair, had not yet been deposed by the City as of the date of the hearing. Tullah claims he had been receiving general assistance from the City for approximately nine months, but was thereafter suspended for missing appointments. City's Opp'n at 16; Pl. Resp. to Def. First Set of Interrogs., Nos. 10, 15, Putterman Decl., Exh. E.

On November 23, 1993, these plaintiffs filed a class action complaint seeking injunctive and declaratory relief against the City.

## II. *Legal Standard*

Plaintiffs have at this time moved the Court to preliminarily enjoin the City's enforcement of certain state and municipal criminal measures which partially define the Matrix Program. Given this posture of the litigation, the Court is called upon to decide whether to grant a preliminary injunction in the exercise of its equitable powers. Fed. R.Civ.P. 65. Such relief constitutes an extraordinary use of the Court's powers, and is to be granted sparingly and with the ultimate aim of preserving the status quo pending trial on the merits. *See* 11 Wright & Miller, Federal Practice and Procedure: Civil § 2942, at 368 (1973); *Rizzo v. Goode*, 423 U.S. 362, 376–78, 96 S.Ct. 598, 607, 46 L.Ed.2d 561 (1976); *Chalk v. United States Dist. Ct.*, 840 F.2d 701, 704 (9th Cir.1988).

As the Court is acting in equity, the decision whether to grant preliminary injunctive relief is largely left to its discretion. *See*

*Big Country Foods, Inc. v. Board of Education of Anchorage School District*, 868 F.2d 1085, 1087 (9th Cir.1989). However, this discretion has been circumscribed by the presence or not of various factors, notably, the likelihood that the moving party will prevail on the merits and the likelihood of harm to the parties from granting or denying the injunctive relief. *See Arcamuzi v. Continental Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir.1987); *Sierra On–Line, Inc. v. Phoenix Software, Inc.*, 739 F.2d 1415, 1421 (9th Cir. 1984). At the extremes, a party seeking injunctive relief must show either (1) a combination of probable success on the merits and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardships tips sharply in the moving party's favor. *Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445, 1448 (9th Cir.1988); *Rodeo Collection, Ltd. v. West Seventh*, 812 F.2d 1215, 1217 (9th Cir. 1987). "These are not two distinct tests, but rather the opposite ends of a single 'continuum in which the required showing of harm varies inversely with the required showing of meritoriousness.'" *Miss World*, 856 F.2d at 1448 (quoting *Rodeo Collection*, 812 F.2d at 1217).

Inasmuch as an injunction creates its own penal code enforceable by the Court's contempt powers, an additional consideration affecting the Court's determination to grant injunctive relief is whether or not the terms of the injunction can be stated with sufficient clarity to permit the injunction to be fairly enforced. The Federal Rules of Civil Procedure require that "[e]very order granting an injunction ... shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained...." Fed.R.Civ.P. 65(d). This mandate is designed "to prevent uncertainty and confusion on the part of those faced with injunctive orders, and to avoid the possible founding of a contempt citation on a decree too vague to be understood.... [B]asic fairness requires that those enjoined receive explicit notice of precisely what conduct is outlawed." *Schmidt v. Lessard*, 414 U.S. 473, 476, 94 S.Ct. 713, 715, 38 L.Ed.2d 661 (1974).

## DISCUSSION

The injunction sought by plaintiffs at this juncture of the litigation must be denied for each of two independent reasons. First, the proposed injunction lacks the necessary specificity to be enforceable, and would give rise to enforcement problems sufficiently inherent as to be incurable by modification of the proposal. Second, those legal theories upon which plaintiffs rely are not plainly applicable to the grievances sought to be vindicated, with the effect that the Court cannot find at this time that, upon conducting the required balance of harm and merit, plaintiffs have established a sufficient probability of success on the merits to warrant injunctive relief.

### I. *Enforceability Problems Inherent in the Proposed Injunction*

Plaintiffs urge the Court to implement an injunction under which:

the City shall be preliminarily enjoined from enforcing, or threatening to enforce, statutes and ordinances prohibiting sleeping, "camping" or "lodging" in public parks, or the obstruction of public sidewalks against the plaintiff class of homeless individuals for life-sustaining activities such as sleeping, sitting or remaining in a public place....

Plaintiffs' Proposed Order Granting Mot. for Prel.Inj. at 2.

■ Those problems invariably arising from attempted compliance with the proposed injunction are apparent on the face of the injunction proposed by plaintiffs. To begin with, the injunction would immunize "life-sustaining activities *such as* sleeping, sitting or remaining in a public place...." *Id.* (emphasis added). Given this malleable phraseology, the proposal is fundamentally uncertain as to what conduct would be immunized from governmental prohibition. Although the language of the proposed injunction would clearly include many such activities, plaintiffs understandably exclude a variety of acts from their proffered examples of "life sustaining activities." This exclusion has the effect of removing the reductio ad absurdum of immunizing from punishment such arguably "life-sustaining activities" as urinating and defecating in public and ag-

gressive panhandling, but it is not a limitation called for by the text of the proposed injunction. *Cf. Glasheen v. City of Austin,* 840 F.Supp. 62 (W.D.Tex.1993) (upholding city ordinance designed to reduce aggressive panhandling); *Young v. New York City Transit Authority,* 903 F.2d 146 (2nd Cir. 1990) (reversing lower court injunction enjoining defendant from prohibiting panhandling).

The converse of this problem—the proposed injunction's protection of activities which cannot be contended to be life sustaining—constitutes an additional infirmity with the proposed relief. For example, the proposed injunction would enjoin enforcement of laws prohibiting obstruction of public sidewalks by homeless individuals. When asked by the Court about this aspect of the injunction, plaintiffs' counsel suggested that if this is seen to be a problem, the City could enact less restrictive alternatives to the present ordinances, such as a prohibition on "obstructing a sidewalk at a time when people actually want to use the sidewalk.... [A]t 3:00 o'clock in the morning ... no one would conceivably want to use that location." Transcript at 86:18–23. This postulate is not self-evident to the Court; nor can it be taken as axiomatic that preventing other persons from using public sidewalks can be said to be a life sustaining activity.

Responding at the hearing to such concerns, counsel for plaintiffs suggested the proposed injunction could be readily amended, *e.g.* by striking the "such as" language from the proposed injunction. Even under such an amendment, and assuming plaintiffs would now make a narrowed list of the laws they seek to enjoin, various problems remain which would frustrate or render impossible enforcement of the proposed injunction. The most weighty of these problems is plaintiffs' stated objective to enjoin only that governmental activity directed at "homeless individuals." *Id.* As that phrase is defined by plaintiffs, classification of a person as "homeless" would require an individualized determination whether that person possessed a "fixed, regular, and adequate nighttime resi-

dence." Plaintiffs' Mot. at 2.[3]

By plaintiffs' reasoning, any persons who did not possess such a residence would be immunized from enforcement of camping and lodging prohibitions, while those who did possess such a residence would not. The impossibility of such enforcement is best illustrated by concrete example. When asked by the Court whether, under the proposed injunction, the City would be able to cite plaintiff Joyce for public camping, counsel for plaintiffs answered as follows: such citation might be permissible if Joyce had lodging available that night, but would be otherwise impermissible. *See* Transcript at 77:3–78:13.

Counsel for plaintiffs suggested at the hearing that enforcement difficulties could be mitigated if police would merely ask questions to determine whether the person is "homeless" before citing him. *See* Transcript at 81:3–5. This suggestion is no solution; the obvious and inevitable permutations of this contemplated enforcement scenario make it plainly unenforceable.

These various, inherent uncertainties militate strongly against the Court's adoption of the proposed injunction or its proposed amended text. This conclusion follows by mandate of the Federal Rules of Civil Procedure, which provide that "[e]very order granting an injunction ... shall be specific in terms; shall describe in reasonable detail, and not by reference to the complaint or other document, the act or acts sought to be restrained...." Fed.R.Civ.P. 65(d). Various courts of review, moreover, when confronted by analogous situations in which unenforceable injunctive relief was sought, have acted in accord. *See Schmidt*, 414 U.S. 473, 94 S.Ct. 713 (vacating order enjoining state officials from enforcing "the present Wisconsin scheme" against those in plaintiff class); *DeBremaecker v. Short*, 433 F.2d 733 (5th Cir.1970) (finding too unspecific a proposed injunction against police intimidation of citizens "active in peace movement").

Given these definitional difficulties, implementation of the proposed injunction would realistically have the effect of requiring the City to altogether cease enforcing the challenged criminal laws. Plaintiffs have essentially acknowledged this result by their argument that, after enjoining enforcement of the listed criminal laws, the Court should continue on to prescribe a narrower "code of conduct" by which only the "homeless" would be immunized from various police enforcement measures. Responding to a question of the Court, counsel for plaintiffs suggested at the hearing that anyone who placed and used three tents on San Francisco's Civic Plaza for a period of three days would have engaged in unpunishable activity under the proposed injunction. *See* Transcript at 72:13–73:10. Plaintiffs, in sum, seek an order of this Court which would render the City altogether powerless to enforce its laws under the circumstances now challenged.

The Court cannot at this time sanction such a result. It would at a minimum be inconsistent with the underlying rationale of preliminary injunctive relief aimed at preservation of the status quo. *See Chalk*, 840 F.2d 701, 704 (9th Cir.1988) (primary purpose of preliminary injunction is to preserve status quo pending determination of action on the merits). A conceivable response to this holding is that the status quo would be maintained by granting the proposed injunction, as it would preserve the ability of the homeless to continue their conduct absent the threat of adverse police activity. Such an argument would be misplaced. The City's homeless have never been altogether immunized from enforcement of the various laws at issue here, whereas the City's prerogative to lawfully enforce the challenged provisions has not been previously disturbed.

Issuance of the proposed injunction would, moreover, necessitate that affirmative steps be taken by police in order to enforce the

**3.** The McKinney Act, which provides this definition, has among its aims the federal funding of various programs of assistance to the homeless. The Act's terms and definitions were not intended by Congress to apply in circumstances not considered by Congress, nor does this Court find Congress' definition an appropriate one under which to view the present claims. As counsel for plaintiffs contended at the hearing, a person living in a housing clinic would generally be considered "homeless" for purposes of the McKinney Act since many clinics are "inadequate." *See* Transcript at 21:3–23:7.

challenged ordinances, *i.e.* determining whether the person had a "fixed, regular, and adequate nighttime residence." The requirement of affirmative conduct has been deemed a factor contrary to preservation of the status quo. *See Southern Alameda Spanish Speaking Organization v. Union City*, 424 F.2d 291, 296 (9th Cir.1970) (affirming denial of injunctive relief where grant of injunction "would require that affirmative steps now be taken in the direction of the ultimate remedy sought by appellants.").

The Court also notes that denial of the injunction at this stage of the litigation is consonant with even those cases said by plaintiffs to be most supportive of their lawsuit. In *Pottinger v. Miami*, 810 F.Supp. 1551, 1583 (S.D.Fla.1992) (appeal pending), the court expressly denied a proposed injunction until sufficient factual findings could be made so as to enable more precise definition of the plaintiffs' allegations. Similarly, in *Church v. City of Huntsville*, No. 93–C–1239–S (N.D.Ala. Sept. 23, 1993), a district court preliminarily enjoined a city from certain acts only after entering various findings of fact following trial on the evidentiary issues.

Accordingly, plaintiffs' proposed order granting injunctive relief must be denied at this time.

II. *Under the Posited Legal Theories, Plaintiffs Have Not Demonstrated a Clear Probability of Success on the Merits*

A. *Whether the Eighth Amendment Prohibits Enforcement of Matrix as Punishing "Status"*

Plaintiffs contend enforcement of the Matrix Program unconstitutionally punishes an asserted "status" of homelessness. The central thesis is that since plaintiffs are compelled to be on the street involuntarily, enforcement of laws which interfere with their ability to carry out life sustaining activities on the street must be prohibited. This argument, while arguably bolstered by decisions of courts in other jurisdictions, has not been adopted by any case within the Ninth Circuit. Moreover, it is the opinion of this Court that

plaintiffs' position, if adopted, would represent an improper reach by this Court into matters appropriately governed by the State of California and the City of San Francisco.

1. *Applicability of the Eighth Amendment to the Present Action*

As a threshold matter, the City argues the Eighth Amendment is not implicated by those enforcement actions taken by the San Francisco Police Department under the Matrix Program. The City argues that the protections of the Eighth Amendment are invoked only when a party has been convicted of a criminal offense, and is therefore not applicable to the present case since none of the four named plaintiffs has been so convicted. This argument is unavailing.

■ Application of the Eighth Amendment, which is binding on states by operation of the Fourteenth Amendment, *see Robinson v. California*, 370 U.S. 660, 665–67, 82 S.Ct. 1417, 1420, 8 L.Ed.2d 758 (1962), principally limits the types of punishment that can be imposed on those convicted of crimes. *Ingraham v. Wright*, 430 U.S. 651, 666–68, 97 S.Ct. 1401, 1410, 51 L.Ed.2d 711 (1977). Although the City claims the protections of the Eighth Amendment are limited "*only* to 'those convicted of crimes'," City's Opp'n at 10 (emphasis in original) (quoting *Ingraham*, 430 U.S. at 664, 97 S.Ct. at 1409), this proposition is refuted by the express language of *Ingraham*. In describing the breadth of application of the Eighth Amendment, the Court provided that, in addition to proscribing certain types of punishments to those convicted of crimes, the amendment "imposes substantive limits on what can be made criminal." *Ingraham*, 430 U.S. at 667, 97 S.Ct. at 1410 (acknowledging "[this] limitation as one to be applied sparingly." *Id.*). Accordingly, the protections of the Eighth Amendment cannot be deemed wholly inapplicable to the controversy now before the Court.

■ Separately, it is nevertheless appropriate for the Court to consider that members of the proposed class have actually been criminally convicted of committing Matrix-related infractions—a fact sufficient in itself to invoke consideration of the Eighth Amendment. The City argues the scope of the

Court's inquiry is limited to injuries incurred by the four named plaintiffs, and that because none of the named plaintiffs to this action has been so convicted, the Eighth Amendment is entirely inapplicable. As support for this assertion, the City cites to *Zepeda v. United States Immigration and Naturalization Service,* 753 F.2d 719 (9th Cir. 1983) (vacating class-wide grant of relief by district court after denial of class certification).

This argument is misplaced; it is instead the case that grievances of all proposed class members are properly in the purview of the Court at this time. "[W]hen the determination of the class action issue is delayed, a suit brought under Rule 23 should be treated as a class action ... until there is a determination that the action may not proceed under the rule." 7B Wright, Miller & Kane, Federal Practice and Procedure § 1785, at 106–07 (1986); *see also N.Y. State Nat. Organization for Women v. Terry,* 697 F.Supp. 1324, 1336 & n. 16 (S.D.N.Y.1988) (permitting class wide relief before class is certified; distinguishing *Zepeda* as a case in which district court had already denied certification of class). Since a determination has not yet been made whether plaintiffs can proceed as a class, it is appropriate at this stage that the Court consider the injuries alleged to individuals within the entire, proposed class. Since those injuries indisputably include criminal convictions of Matrix-related offenses, the applicability of the Eighth Amendment to this action can be considered to be established.

■ Finally, even in the event the Court were to restrict its inquiry in the manner the City contends is required, those injuries alleged by the named plaintiffs would suffice to invoke consideration of the Eighth Amendment. "[F]ines ... traditionally have been associated with the criminal process" and subjected to the limitations provided by the Eighth Amendment. *Ingraham,* 430 U.S. at 664, 97 S.Ct. at 1408. As it is the case that plaintiff O'Halloran has paid a fine imposed by citation, *see* Plaintiffs' Reply at 6; Bleich Decl., Exh. 2, the City's argument as to the wholesale inapplicability of the Eighth Amendment must be rejected.

### 2. Whether Homelessness is a "Status," so that Certain Acts of the Homeless are Protected from Penal Enforcement

■ Two Supreme Court decisions guide a determination of which behavior is to be deemed derivative of one's status, and therefore accorded constitutional protection from criminal prohibition. In *Robinson,* the Supreme Court held violative of the Eighth Amendment a California statute making it a criminal offense to "be addicted to the use of narcotics." 370 U.S. at 660 & n. 1, 82 S.Ct. at 1417 & n. 1. The Court explained that conviction under the statute was predicated not on the commission of any particular act, but merely on the " 'status' of narcotic addiction." *Id.* at 666, 82 S.Ct. at 1420. Equating narcotic addiction with illness, the Court wrote,

> It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease.... But ... a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment of the Eighth and Fourteenth Amendments.

*Id.*

Six years later, a plurality of the Court found no Eighth Amendment infirmity in a Texas statute penalizing one for being found in a state of intoxication in a public place. *Powell v. Texas,* 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968). Writing for the four-Justice plurality, Justice Marshall rejected the appellant's argument that he "was 'afflicted with the disease of chronic alcoholism,' [and] that 'his appearance in public [while drunk was] ... not of his own volition'." *Id.* In so holding, the plurality refused to adopt a "constitutional holding that 'a person may not be punished if the condition essential to constitute the defined crime is part of the pattern of his disease and is occasioned by a compulsion symptomatic of the disease.'" *Id.* at 521, 88 S.Ct. at 2149. Distinguishing the Court's decision in *Robinson,* Justice Marshall wrote,

[A]ppellant was convicted, not for being a chronic alcoholic, but for being in public while drunk on a particular occasion. The State of Texas thus has not sought to punish a mere status, as California did in *Robinson....* Rather, it has imposed upon appellant a criminal sanction for public behavior.... This seems a far cry from convicting one for being an addict, being a chronic alcoholic, being 'mentally ill, or a leper....'

*Id.* at 532, 88 S.Ct. at 2154 (quoting *Robinson,* 370 U.S. at 666, 82 S.Ct. at 1420).

Plaintiffs argue, however, on the basis of Justice White's concurring opinion,[4] that *Powell* was decided as it was solely because the convicted defendant had not been shown to be on the streets involuntarily. *See* Plaintiffs' Mot. at 12; Plaintiffs' Reply at 12–14. In casting the fifth vote to uphold the appellant's conviction in *Powell,* Justice White wrote,

> The fact remains that some chronic alcoholics must drink and hence must drink *somewhere.* Although many chronics have homes, many others do not. For all practical purposes the public streets may be home for these unfortunates, not because their disease compels them to be there, but because, drunk or sober, they have no place else to go and no place else to be when they are drinking. This is more a function of economic station than of disease, although the disease may lead to destitution and perpetuate that condition. For some of these alcoholics I would think a showing could be made that resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible. As applied to them this statute is in effect a law which bans a single act for which they may not be convicted under the Eighth Amendment—the act of getting drunk.

392 U.S. at 551, 88 S.Ct. at 2163–64 (emphasis in original; footnote omitted).

Plaintiffs contend on the basis of this concurring opinion that, had the appellant in *Powell* been homeless, five justices would have voted to reverse his conviction. *See*

Reply at 13. "*Powell* effectively establishes that a person who is involuntarily in public may not be punished for doing an act or being in a condition that he or she is powerless to avoid." *Id.*

#### a. Decisions Striking Vagrancy Statutes

As a threshold matter, plaintiffs' citation to various court decisions striking down statutes criminalizing vagrancy is of indirect assistance to the present analysis. *See* Plaintiffs' Mot. at 12–14. The statutes found offensive to the Constitution targeted, either explicitly or otherwise, "vagrancy." *See, e.g., Wheeler v. Goodman,* 306 F.Supp. 58, 62 (W.D.N.C.1969), *vacated on other grounds,* 401 U.S. 987, 91 S.Ct. 1219, 28 L.Ed.2d 524 (1971) (statute criminalizing "vagrancy" violative of Eighth Amendment); *Goldman v. Knecht,* 295 F.Supp. 897 (D.Colo.1969) (statute outlawing "vagrancy" violative of Due Process Clause of Fourteenth Amendment); *see also Smith v. Hill,* 285 F.Supp. 556, 558 (E.D.N.C.1968).

The present efforts under the Matrix Program are dissimilar from those successfully challenged in the above cases. Matrix targets the commission of discrete acts of conduct, not a person's appearance as a vagrant *vel non.* To the extent plaintiffs argue that enforcement efforts pursuant to Matrix are, in practice, the equivalents of vagrancy statutes, those authorities discussed below more specifically address that particular contention.

#### b. Lower Court Applications of Robinson to Police Efforts Adversely Impacting the Homeless

A line of reasoning extending unconstitutional status penalizations to acts of the homeless has been adopted by at least two federal district courts and, most recently, a California court of appeal. In *Pottinger v. Miami,* 810 F.Supp. 1551, 1561–65 (S.D.Fla. 1992) (appeal pending), a district court extended the protections of the Eighth Amendment to limit the criminal prohibition of "innocent conduct" derivative of a certified class' status as homeless. In *Church v. City of Huntsville,* No. 93–C–1239–S, slip op. at 2

---

4. Justice White voted to affirm the conviction on the basis that the appellant had failed to prove he had been in public involuntarily. *See* 392 U.S. at 553–55, 88 S.Ct. at 2165.

(N.D.Ala. Sept. 23, 1993), a district court preliminarily enjoined a city from "harassing, intimidating, detaining or arresting members of the defined class, *solely because of their status as homeless persons,* for walking, talking, sleeping, or gathering in parks or other public places in the City of Huntsville." (emphasis in original).[5] Most recently, in *Tobe v. City of Santa Ana,* 22 Cal.App.4th 228, 27 Cal.Rptr.2d 386 (1994), a California court of appeal held, *inter alia,* that enforcement of a "camping ordinance" offended the protections of the Eighth Amendment.

The City emphasizes that the Matrix Program is far more comprehensive than those efforts challenged in the above cases, particularly with respect to Matrix's enforcement of numerous prohibitions against acts other than "innocent ones" such as sleeping and eating in public.[6] *See* City's Opp'n at 1. In any event, this distinction is of little relevance, since plaintiffs seek to enjoin only police activity prohibiting "life-sustaining activities such as sleeping, sitting or remaining in a public place...." *See* Plaintiffs' Proposed Order at 2.

### c. *Viability of Depicting Homelessness as Status*

In moving the Court to implement the proposed injunctive relief, plaintiffs are unable to demonstrate a substantial likelihood of success on the merits of the underlying suit. The ultimate resolution of this lawsuit will require acceptance or rejection of the reasoning in those cases granting constitutional protection to acts derivative of a "sta-

tus" of homelessness. The conclusion that such acts are protected appears, for various reasons, sufficiently problematic to discourage this Court from following at this time in its jurisprudential path.

Depicting homelessness as "status" is by no means self-evident, as the appellate court in *Tobe* suggests,[7] and as the court in *Huntsville* presumes.[8] That depiction, made upon serious analysis only in *Pottinger,* is a dubious extension of *Robinson* and *Powell,* and of questionable merit in light of concerns implicating federalism and the proper role of the Court in such adjudications.

Insofar as *Pottinger* attempts to reason from applicable Supreme Court precedent that homelessness equals a "status," and that acts derivative of such status are constitutionally protected, the reasoning of that court cannot be said at this stage of the litigation to be sufficiently persuasive to indicate a likely possibility of success on the merits of the underlying suit. *Pottinger* explained that,

> [while a]n initial reading of Powell suggests that all conduct is outside the rule of *Robinson* ... [the] plurality was not confronted with a critical distinguishing factor that is unique to the plight of the homeless plaintiffs in this case: that they have no realistic choice but to live in public places.

*Id.* at 1563. Finding as a matter of fact that being homeless is only "rarely" a choice, *id.,* and that alternative shelter was unavailable, *id.* at 1564, the court held that:

> Similarly, the court in *Tobe* was exclusively concerned with a "camping ordinance" limiting the permissible uses of public streets and areas. In contrast to these measures, the Matrix Program is addressed in large part at prohibiting such conduct which is unmistakably "harmful" to plaintiffs or others. *See supra* at 846–47.

5. In preliminary findings, the court found the "unannounced, but nonetheless official, policy of the City of Huntsville to isolate homeless citizens from the established residential areas ... [and] 'show these folks where the city limits are....,' i.e., to remove this class of citizens from Huntsville." *Huntsville,* Prelim. Fdgs. at ¶5 (N.D.Ala. Sept. 23, 1993).

6. For example, the programs operated by Miami and San Francisco are not, as plaintiffs suggest, "virtually identical." In *Pottinger,* the court found the Eighth Amendment violated when the City punished "sleeping, eating and other innocent conduct." *Id.* at 1565. The court emphasized that "plaintiffs [had] not argued that the City should not be able to arrest them for public drunkenness or any type of conduct that might be harmful to themselves or to others." *Id.*

7. In *Tobe,* the court engaged in an abbreviated policy analysis yielding the conclusion that homelessness is a status; the court's citations to *Robinson* and *Powell* were no more than ornamental.

8. Neither the preliminary injunction nor the preliminary findings issued by the court in *Huntsville* cites to a single case or engages in any analysis with respect to the legal issues presented.

plaintiffs have no choice but to conduct involuntary, life-sustaining activities in public places. The harmless conduct for which they are arrested is inseparable from their involuntary condition of being homeless.

*Id.* The Court concluded that the City of Miami was liable to a class of homeless plaintiffs for "effectively punish[ing] them for something for which they may not be convicted under the eighth amendment." *Id.* at 1565.

This Court is unable to conclude at this time that the extension of the Eighth Amendment to the "acts" at issue here is warranted by governing authorities. Plaintiffs argue that the failure of the City to provide sufficient housing compels the conclusion that homelessness on the streets of San Francisco is cognizable as a status. This argument is unavailing at least for the fundamental reason that status cannot be defined as a function of the discretionary acts of others.[9]

On no occasion, moreover, has the Supreme Court invoked the Eighth Amendment in order to protect acts derivative of a person's status. *Robinson* prohibited penalizing a person based on their status as having been addicted, whereas the plurality in *Powell* approved a state's prosecution of the act of appearing intoxicated in public. What justified invocation of the Eighth Amendment in one case and not the other was not the difference between drug and alcohol addiction; such distinction is without analytical difference. Rather, the different results were reached because of the distinct targets of the challenged laws—one punished a status, the other an act. Justice Black, concurring in the plurality opinion in *Powell,* explained,

> [In *Robinson,* we] explicitly limited our holding to the situation where no conduct of any kind is involved.... [A]ny attempt to explain *Robinson* as based solely on the lack of voluntariness encounters a number of logical difficulties....

9. As the Supreme Court has declined to find any "constitutional guarantee of access to dwellings of a particular quality," *Lindsey v. Normet,* 405 U.S. 56, 74, 92 S.Ct. 862, 874, 31 L.Ed.2d 36

392 U.S. at 542, 88 S.Ct. at 2159 (Black, J., concurring).

Plaintiffs' argument that *Powell* would have been differently decided had the defendant been homeless does not reflect the holding of the case and is sheer speculation. While language in Justice White's concurrence can be argued to support that contention, such language was dicta. One can only hypothesize that Justice White would actually have cast his vote differently had the defendant been homeless. Nothing underscores this point more vividly than the fact that Justice White was one of two vigorous dissenters in *Robinson.*

■ As an analytical matter, more fundamentally, homelessness is not readily classified as a "status." Rather, as expressed for the plurality in *Powell* by Justice Marshall, there is a "substantial definitional distinction between a 'status' ... and a 'condition,'...." 392 U.S. at 533, 88 S.Ct. at 2155. While the concept of status might elude perfect definition, certain factors assist in its determination, such as the involuntariness of the acquisition of that quality (including the presence or not of that characteristic at birth), *see Robinson,* 370 U.S. at 665–69 & n. 9, 82 S.Ct. at 1420–21 & n. 9, and the degree to which an individual has control over that characteristic.

Examples of such "status" characteristics might include age, race, gender, national origin and illness. The reasoning of the Court in including drug addiction as status involved the analogy of drug addiction to a disease or an illness which might be contracted involuntarily. *See id.* While homelessness can be thrust upon an unwitting recipient, and while a person may be largely incapable of changing that condition, the distinction between the ability to eliminate one's drug addiction as compared to one's homelessness is a distinction in kind as much as in degree. To argue that homelessness is a status and not a condition, moreover, is to deny the efficacy of acts of social intervention to change the condition of those currently homeless.

(1972), the housing provided to the City's homeless is a matter for the discretion of the City and State.

The Court must approach with hesitation any argument that science or statistics compels a conclusion that a certain condition be defined as a status. The Supreme Court has determined that drug addiction equals a status, and this Court is so bound. But the Supreme Court has not made such a determination with respect to homelessness, and because that situation is not directly analogous to drug addiction, it would be an untoward excursion by this Court into matters of social policy to accord to homelessness the protection of status.

In addition to the fact that homelessness does not analytically fit into a definition of a status under the contours of governing case law, the effects which would ensue from such a determination by this Court would be staggering. Courts seeking analytical consistency with such a holding would be required to provide constitutional protection to any condition over which a showing could be made that the defendant had no control. The natural consequence of such a recognition was clear to Justice White, who wrote that "[i]f it is 'cruel and unusual punishment' to convict appellant for addiction [*i.e.* status], it is difficult to understand why it would be any less offensive ... to convict him for use on the same evidence of use which proved he was an addict. [*i.e.* acts derivative of status]." *Robinson*, 370 U.S. at 688, 82 S.Ct. at 1431–32 (dissenting opn.).

Consistent with these concerns is the devastating impact on state and local law enforcement efforts which a declaration of status would effect. As Justice Marshall wrote in *Powell*, recognition by federal courts of such status would create a "constitutional doctrine of criminal responsibility" in conflict with "essential considerations of federalism...." 392 U.S. at 535, 88 S.Ct. at 2155. In the same vein, Justice Black in his concurring opinion in *Powell* declined to erect the constitutional barrier sought by the defendant, explaining that,

> To adopt this position would significantly limit the States in their efforts to deal with a widespread and important social problem and would do so by announcing a revolutionary doctrine of constitutional law that would also tightly restrict state power to

deal with a wide variety of other harmful conduct.

*Id.* at 537, 88 S.Ct. at 2156–57. By parity of reasoning, this Court is convinced that adopting the central thesis of plaintiffs in this case would be an equally revolutionary doctrinal decision and would be an equally inappropriate intrusion into state and local authority.

Although the plaintiffs' Eighth Amendment challenge to the Matrix Program law enforcement activities will appropriately be subject to further scrutiny in this case, on this record the plaintiffs have not demonstrated a probability of success on the merits of this claim.

### B. *Whether Matrix Violates the Equal Protection Clause*

Predicate to an equal protection clause violation is a finding of governmental action undertaken with an intent to discriminate against a particular individual or class of individuals. *See Personnel Administrator of Mass. v. Feeney*, 442 U.S. 256, 271–72, 99 S.Ct. 2282, 2292, 60 L.Ed.2d 870 (1979). Such intent may be evinced by statutory language, *see, e.g., Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), or in instances where an impact which cannot be explained on a neutral ground unmasks an invidious discrimination. *See, e.g., Yick Wo v. Hopkins*, 118 U.S. 356, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); *Feeney*, 442 U.S. at 274–76, 99 S.Ct. at 2294. Under the latter approach, a neutral law found to have a disproportionately adverse effect upon a minority classification will be deemed unconstitutional only if that impact can be traced to a discriminatory purpose. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976); *Feeney*, 442 U.S. at 272, 99 S.Ct. at 2292 ("When the basic classification is rationally related, uneven effects upon particular groups within a class are ordinarily of no constitutional concern.").

In the present case, plaintiffs have not at this time demonstrated a likelihood of success on the merits of the equal protection claim, since the City's action has not been taken with an evinced intent to discriminate against an identifiable group. As discussed

above, various directives issued within the Police Department mandate the non-discriminatory enforcement of Matrix. *See, e.g.,* "Update on Matrix Quality of Life Program," Petrini Decl., Exh. A at 1–2 (providing that "[r]ights of the homeless must be preserved"); Department Bulletin on "Rights of the Homeless", discussed in Petrini Decl. at ¶ 2 (stating that "[all members of the Department] are obligated to treat all persons equally, regardless of their economic or living conditions. The homeless enjoy the same legal and individual rights afforded to others. Members shall at all times respect these rights...."). Further, the Police Department has, during the pendency of the Matrix Program, conducted continuing education for officers regarding non-discriminatory enforcement of the Program. City's Opp'n at 8.

It has not been proven at this time that Matrix was implemented with the aim of discriminating against the homeless. That enforcement of Matrix will, de facto, fall predominantly on the homeless does not in itself effect an equal protection clause violation. *See* City's Opp'n at 22. Notably, the absence of such a finding of intentional discrimination at this time distinguishes the present case from *United States Dept. of Agriculture v. Moreno,* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973) (invalidating federal statute that excluded recipients living with unrelated individuals from participation in food stamp program, where legislative history evinced intent to prevent "hippies" and "hippie communities" from participating), *City of Cleburne v. Cleburne Living Ctr., Inc.,* 473 U.S. 432, 437, 105 S.Ct. 3249, 3253, 87 L.Ed.2d 313 (1985) (overturning city's decision, taken pursuant to zoning ordinance, denying permit for a home for mentally retarded where "motivated primarily by the fact that the residents [were] mentally retarded"), and *Parr v. Municipal Court,* 3 Cal.3d 861, 863, 92 Cal.Rptr. 153, 479 P.2d 353, *cert. denied,* 404 U.S. 869, 92 S.Ct. 46, 30 L.Ed.2d 113 (1971) (finding unconstitutional a city ordinance enacted with an accompanying declaration condemning "undesirable and unsanitary visitors ... sometimes known as 'hippies'"). In each of these cases, either the statutory language or the legislative history underlying the challenged measure revealed an intent to discriminate against a particular group. *See* City's Opp'n at 22–23.

■ Even were plaintiffs able at this time to prove an intent to discriminate against the homeless, the challenged sections of the Program might nonetheless survive constitutional scrutiny. Only in cases where the challenged action is aimed at a suspect classification, such as race or gender, or premised upon the exercise of a fundamental right, will the governmental action be subjected to a heightened scrutiny. *See Feeney,* 442 U.S. at 271–74, 99 S.Ct. at 2292–93.

■ Counsel for plaintiff proposed at the hearing that this Court should be the first to recognize as a fundamental right the "right to sleep." *See* Transcript at 35:4–16. This is an invitation the Court, in its exercise of judicial restraint, must decline. Despite the seeming innocence of a right so defined, the natural corollary to recognition of a right is an obligation to enforce it. The discovery of a right to sleep concomitantly requires prohibition of the government's interference with that right. This endeavor, aside from creating a jurisprudential morass, would involve this unelected branch of government in a legislative role for which it is neither fit, nor easily divested once established.

■ It is accordingly likely that a classification of the homeless would be subjected only to a rational basis review, which the City might well prove in this instance. As the Court has declined to find suspect classifications on the basis of either wealth, *Kadrmas v. Dickinson Public Schools,* 487 U.S. 450, 108 S.Ct. 2481, 101 L.Ed.2d 399 (1988), or housing, *Lindsey,* 405 U.S. 56, 92 S.Ct. 862, the challenged Program would likely be tested only against a rational basis. Moreover, the very fact of a discriminatory purpose may not invalidate a measure otherwise subject to rational basis review. In *Parr,* a four-three decision adjudicating an equal protection claim on federal constitutional grounds, the dissenting opinion noted:

'the consideration of motive is complicated by the fact that it is altogether possible for a law which is the expression of a forbidden motive *to be a good law.* What is to

be done with a law which, passed with the most questionable of motives, still makes a positive contribution to the public good? ...' ... [E]ven if we assume [the challenged ordinance was motivated by a discriminatory intent], that ordinance by its terms applies to 'any person' violating its provisions. In spite of its assuredly improper motives, it is a 'good law.'

3 Cal.3d at 872, 92 Cal.Rptr. 153, 479 P.2d 353 (Burke, J., dissenting) (emphasis in original; citations omitted). Because the challenged Program might therefore be determined to be rationally related to assertedly legitimate interests of protecting public safety and health, and preserving parks for their intended purposes, see City's Opp'n at 22, a finding by the Court that plaintiffs had proved a substantial likelihood of success on the merits of the equal protection claim is not proper on this record.

C. *Whether the Matrix Program Impermissibly Burdens the Right to Travel*

██ This argument proffered by plaintiffs is essentially a subset of equal protection analysis, in which the right to travel is deemed a fundamental right which a state government may not abridge unless necessary to achieve a compelling state interest. *See Shapiro v. Thompson,* 394 U.S. 618, 627–35, 89 S.Ct. 1322, 1328–31, 22 L.Ed.2d 600 (1969). The right to travel has found its strongest expression in the context of attempts by states to discourage the immigration of indigents. The application of strict scrutiny to such laws, however, has been limited to those which are facially discriminatory. *See id.* (holding unconstitutional statutory provision requiring welfare assistance applicants to reside in state at least one year immediately preceding application for assistance); *Edwards v. California,* 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941) (curtailing immigration of new residents); *Memorial Hospital v. Maricopa County,* 415 U.S. 250, 94 S.Ct. 1076, 39 L.Ed.2d 306 (1974) (denying medical services to new residents).

The Matrix Program does not facially discriminate between those who are, and those who might be, the City's residents. Accordingly, the application of strict scrutiny to the Program would be unwarranted. *See* City's Opp'n at 20. Again, plaintiffs cite *Pottinger, Huntsville* and *Tobe* in support of their argument; this Court cannot conclude at this time that each case is sufficiently persuasive that it should now be followed.

As *Huntsville* does not even discuss the right to travel, *see* Plaintiffs' Mot. at 19–20, it cannot be deemed supporting authority. *Pottinger* and *Tobe,* conversely, address the issue squarely, but in a manner which is not necessarily persuasive to the Court. Applying strict scrutiny to the challenged enforcement efforts, the court in *Pottinger* found the City's arrests violative of the right to travel:

> [E]nforcement of the challenged ordinances against homeless individuals significantly burdens their freedom of movement. It has the effect of preventing homeless people from coming into the City. Primarily, however, it has the effect of expelling those already present and of significantly burdening their freedom of movement within the City and the state.

810 F.Supp. at 1581.

These decisions constitute extensions of the right to travel which may well be unwarranted under governing Supreme Court precedent. Initially, to the extent these cases apply strict scrutiny to facially neutral laws impacting intrastate travel, they may be wrongly decided. Assuming the right to travel encompasses protection to intrastate travel,[10] it is nevertheless doubtful that facially neutral laws impacting intrastate travel should be subjected to such strict scrutiny. "Both the United States Supreme Court and [the California Supreme Court] have refused to apply the strict construction test to legislation ... which does not penalize travel and

10. The Supreme Court has not directly addressed whether the right to travel includes intrastate travel. *See Pottinger* 810 F.Supp. at 1579. The Court has suggested, however, that such a broad reading is permissible. *See Kolender v. Lawson,* 461 U.S. 352, 355–56, 103 S.Ct. 1855, 1857, 75 L.Ed.2d 903 (1983) (law prohibiting wandering the streets at night without identification implicated "consideration of the constitutional right to freedom of movement."). Moreover, the federal circuit courts of appeals have uniformly held that the right encompasses intrastate travel. *See* Plaintiffs' Mot. at 19 n. 10.

resettlement [through disparate treatment] but merely makes it more difficult for the outsider to establish his residence in the place of his choosing." *Associated Home Builders v. Livermore,* 18 Cal.3d 582, 603, 135 Cal.Rptr. 41, 557 P.2d 473 (1976). Insofar as the courts in *Pottinger* and *Tobe* invalidate not facially discriminatory measures, but police efforts adversely impacting the homeless, those decisions are not sufficiently persuasive to convince this Court of any likelihood of success on the merits of the right to travel claim.

### D. Whether the Matrix Program Violates Plaintiffs' Rights to Due Process of Law

Plaintiffs contend the Matrix Program has been enforced in violation of the due process clauses of the United States and California Constitutions. Since plaintiffs have not specifically identified any authority supporting a broader reading of due process protections on independent state constitutional grounds, *see* Cal. Const., art. 1, § 7(a), the Fourteenth Amendment to the United States Constitution provides the appropriate analysis. Plaintiffs specifically argue that due process has been violated by employing punitive policing measures against the homeless for sleeping in public parks; plaintiffs also argue that certain state codes are unconstitutionally vague.

#### 1. Punishing the Homeless for Sitting or Sleeping in Parks

Plaintiffs claim that San Francisco Park Code section 3.12 has been applied by police in an unconstitutional manner. That section provides,

> No person shall construct or maintain any building, structure, tent or any other thing in any park that may be used for housing accommodations or camping, except by permission from the Recreation and Park Commission.

San Francisco, Cal., Park Code § 3.12 (1981). Plaintiffs contend the Police Department has impermissibly construed this provision to justify citing, arresting, threatening and "moving along" those "persons guilty of nothing more than sitting on park benches with their personal possessions or lying on or under blankets on the ground." Plaintiffs' Mot. at 21–22. Plaintiffs have submitted declarations of various homeless persons supporting the asserted application of the San Francisco Park Code section. *See, e.g.,* Homeless Decls. at 34 (lying down atop blankets eating lunch), 121 ("sleeping on bench"), 125 ("sleeping on boxes").

■ It appears, if plaintiffs have accurately depicted the manner in which the section is enforced, that the section may have been applied to conduct not covered by the section and may have been enforced unconstitutionally. The City's initial defense, which is wrongly invoked, is that the defendant to this action is not an individual officer, but the City itself, which will not be found liable unless its officers committed an act pursuant to a "formal policy" or a "longstanding practice or custom which constitutes the 'standard operating procedure' of the local governmental entity." *Gillette v. Delmore,* 979 F.2d 1342, 1346 (9th Cir.1992). The City argues that because its police officers were continually educated in the proper enforcement of the camping ordinance, *see, e.g.,* Petrini Decl., Exh. A (instructing police officers that "[t]he mere lying or sleeping on or in a bedroll in and of itself does not constitute a violation"), plaintiffs would be unable to succeed on the merits of this claim. This defense misreads governing law. Where prospective relief only is sought, the Ninth Circuit has provided that the "official policy or custom requirement" does not apply. *See Chaloux v. Killeen,* 886 F.2d 247, 250–51 (9th Cir.1989); Reply at 27.

■ Issuance of the remedy sought by plaintiffs would nevertheless be premature at this stage of the litigation. Police have been continually and increasingly educated in proper enforcement of the measures. Moreover, as it appears many of the alleged violations occurred prior to such instructions, it has not been sufficiently demonstrated by plaintiffs that the problematic enforcement continues, such that the continuing injury predicate to issuance of injunctive relief still exists. *See Pomerantz v. County of Los Angeles,* 674 F.2d 1288 (9th Cir.1982) (finding

of mootness generally bars a court from considering claim for injunctive relief).

### 2. Overbreadth and Vagueness Challenges to Enforcement Measures

Plaintiffs also contend that San Francisco Park Code section 3.12, discussed *supra*, and California Penal Code Section 647(i) [11] are unconstitutionally overbroad and vague. "[A] court's first task is to determine whether the enactment reaches a substantial amount of constitutionally protected conduct. If it does not, then the *overbreadth* challenge must fail. The court should then examine the facial *vagueness* challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications.... A court should therefore examine the complainant's conduct before analyzing other hypothetical applications of the law." *Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 494–95, 102 S.Ct. 1186, 1191, 71 L.Ed.2d 362 (1982) (emphasis added; footnote omitted).

■ It is unlikely that the overbreadth and vagueness challenges can be maintained. Overbreadth is a challenge which may be successfully leveled only where First Amendment concerns are at stake. *See Schall v. Martin*, 467 U.S. 253, 268 n. 18, 104 S.Ct. 2403, 2412 n. 18, 81 L.Ed.2d 207 (1984) ("[O]utside the limited First Amendment context, a criminal statute may not be attacked as overbroad."). The applicability of the First Amendment to the present case has not been suggested by any of the parties, nor would such an argument strike the Court as a meritorious one. Accordingly, sufficient problems attach to the overbreadth challenge that it cannot support plaintiffs' request for injunctive relief.

■ The possible success of the vagueness challenge is also in doubt, as it seems readily apparent the measure is not "impermissibly vague in all of its applications...."

*Village of Hoffman Est.*, 455 U.S. at 495, 102 S.Ct. at 1191. This likely failing follows from plaintiffs' inability to prove at this stage that police have been granted an excess of discretion pursuant to the statute. Plaintiffs assert vagueness in the San Francisco Park Code prohibition against maintaining "any other thing" that "may be used for ... camping", and in enforcing the Penal Code prohibition against one "who lodges in ... public," Plaintiffs' Mot. at 23–24, claiming "[t]he vagueness of these [Park Code] terms has apparently allowed San Francisco police officers to determine that blankets or possessions in carts are sufficiently connected to 'camping' to violate the ordinance." *Id.* at 23. Plaintiffs have also submitted declarations of homeless persons supporting these assertions, and a concession by Assistant District Attorney Paul Cummins to the effect that the standards for enforcement are vague. *See id.* at 24.

In consideration of plaintiffs' burden to prove the section "impermissibly vague in all of its applications," *Village of Hoffman Est.*, 455 U.S. at 495, 102 S.Ct. at 1191, it is not clear to the Court that plaintiffs can make this showing with respect to the challenged ordinance. A decision of persuasive authority supports this "common-sense understanding of camping." *See United States v. Thomas*, 864 F.2d 188, 196 (D.C.Cir.1988) (upholding camping regulations against vagueness challenge). Moreover, numerous directives within the Police Department defend the measures against the charge of problematic enforcement. The City contends that the Police Department's enforcement memoranda limit application of the ordinance to situations where the person has set up living accommodations. *See* City's Opp'n at 25; Petrini Decl., Exh. C ("indicia of camping may include the accoutrements of a campsite, such as cooking utensils, clothing hung out, groups of sleeping bags and bedding in a cluster, etc.").

11. That section provides:
   Every person who commits any of the following acts is guilty of disorderly conduct, a misdemeanor: ... Who lodges in any building, structure, vehicle, or place, whether public or private, without the permission of the owner or person entitled to the possession or in control thereof.
   Cal. Penal Code § 647(i).

Similarly, the challenged Penal Code section cannot be concluded by the Court at this time to be unconstitutionally vague. Read in conjunction with supplemental memoranda, the challenged measures appear, as a constitutional matter, sufficiently specific. Police officers were specifically cautioned in a September 17, 1993 memorandum that "the mere lying or sleeping on or in a bedroll of and in itself does not constitute a violation." *See* Petrini Decl., Exh. A. While plaintiffs argue the additional memoranda were circulated too late to save the enforcement measures from vagueness, *see* Reply at 23, and also that they do not eliminate the confusion, it is far from clear that plaintiffs could meet the requisite showing that the measure was impermissibly vague in all its applications. Accordingly, even if the limits of permissible enforcement of these sections have not been perfectly elucidated, preliminary injunctive relief is inappropriate at this stage of the litigation.

### E.  *The Reasonableness of Police Seizures of Property*

Plaintiffs contend that under the auspices of "cleaning up the streets," the City has been responsible for the confiscation and destruction of the private property of the homeless in violation of the Fourth Amendment to the United States Constitution, as well as the California Constitution and California Civil Code section 2080. Plaintiffs' Mot. at 24.

■■■ Under the Fourth Amendment prohibition of "unreasonable searches and seizures," U.S. Const. amend IV, a seizure has been found to occur whenever "there is some meaningful interference with an individual's possessory interests in that property." *Soldal v. Cook County*, — U.S. —, —, 113 S.Ct. 538, 544, 121 L.Ed.2d 450 (1992). A seizure is deemed unreasonable if the government's legitimate interest in the search or seizure does not outweigh the individual's interest in the property seized.

Under California law,

Any person who finds and takes possession of any ... personal property ... shall, within a reasonable time, inform the owner, if known, and make restitution without compensation, except a reasonable charge for saving and taking care of the property.

Cal.Civ.Code § 2080. Alternatively, a city "may adopt reasonable regulations for the care, restitution, sale, or destruction of unclaimed property in its possession." Cal.Civ. Code § 2080.6.

Police Department General Order No. Q–1, presumably enacted pursuant to Cal.Civ. Code § 2080.6, provides a detailed procedure for the identification and safekeeping of property which comes into the possession of the police. That property which is believed to be abandoned must be "returned to its rightful owner at the district station if the property cannot be connected to a crime and is otherwise legal to possess." "General Order Q–1," Rosen Decl., Exh 10 at 5.

Plaintiffs argue the City has failed to comply with the requirements of Civil Code section 2080 or with General Order Q–1, and that the resulting procedures utilized by police have effected a constitutional violation. In conjunction with their argument, plaintiffs cite numerous supporting declarations. *See, e.g.* T. Smith Decl. (all personal belongings including medicine confiscated and destroyed).

■■■ Initially, the City defends on the basis that there is no reasonable expectation of privacy when property is left unattended in public places, citing *United States v. Wider*, 951 F.2d 1283 (D.C.Cir.1991) (satchel left on public steps). As plaintiffs correctly argue, however, this is true only where the property is intentionally abandoned. *See id.* (crack cocaine intentionally abandoned by suspect fleeing from police).

■■■ Fourth Amendment protections therefore attach to unattended property, and a constitutional analysis is appropriate in the present case. The City argues that, while the law protects unabandoned property left in public places, *see* Cal.Civ.Code § 1808; San Francisco Police Code § 1400, neither state nor local laws protect abandoned property. City's Opp'n at 27 (citing Cal.Civ.Code § 2080.7); San Francisco Police Code § 1408. The City argues the distinction between abandoned and unabandoned property involves a "difficult determination", and that

in order to insure that unabandoned property is stored and held for possible return to its owner, "the City recently has promulgated policies to address this issue." City's Opp'n at 27. Specifically, the City cites the practice of the Department of Public Works which directs that property of value found in encampment or other public places is to be bagged, tagged and held at a dispatch office for its owner within ninety days. *Id.*

Given this new procedure, the constitutionality of which is not challenged by plaintiffs, it is clear that the Fourth Amendment argument cannot constitute the basis for injunctive relief at this time. Plaintiffs argue only that the procedure was begun belatedly—on January 3, 1994—and seemed "timed to anticipate legal action." Replay at 30 & n. 25. Plaintiffs' unsubstantiated assertion that the injunction should be granted to prevent a "likelihood of recurrence," *id.* at 30, is speculative. Such a likelihood is sufficiently attenuated that a grant of injunctive relief, though perhaps appropriate before the new procedure was implemented, should not issue at this time. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 110–12, 103 S.Ct. 1660, 1670, 75 L.Ed.2d 675 (1983) (equitable relief unavailable where no showing of any real or immediate threat that plaintiff will be wronged again).

## CONCLUSION

In common with many communities across the country, the City is faced with a homeless population of tragic dimension. Today, plaintiffs have brought that societal problem before the Court, seeking a legal judgment on the efforts adopted by the City in response to this problem.

The role of the Court is limited structurally by the fact that it may exercise only judicial power, and technically by the fact that plaintiffs seek extraordinary pre-trial relief. The Court does not find that plaintiffs have made a showing at this time that constitutional barriers exist which preclude that effort. Accordingly, the Court's judgment at this stage of the litigation is to permit the City to continue enforcing those aspects of the Matrix Program now challenged by plaintiffs.

The Court therefore concludes that the injunction sought, both as it stands now and as plaintiffs have proposed to modify it, is not sufficiently specific to be enforceable. Further, upon conducting the required balance of harm and merit, the Court finds that plaintiffs have failed to establish a sufficient probability of success on the merits to warrant injunctive relief. Accordingly, plaintiffs' motion for a preliminary injunction is DENIED.

IT IS SO ORDERED.