Opinion by Judge Wardlaw; Dissent by Judge Rymer
WARDLAW, Circuit Judge.
Six homeless individuals, unable to obtain shelter on the night each was cited or arrested, filed this Eighth Amendment challenge to the enforcement of a City of Los Angeles ordinance that criminalizes sitting, lying, or sleeping on public streets and sidewalks at all times and in all places within Los Angeles’s city limits. Appellants seek limited injunctive relief from enforcement of the ordinance during nighttime hours, i.e., between 9:00 p.m. and 6:30 a.m., or at any time against the temporarily infirm or permanently disabled. We must decide whether the Eighth Amendment right to be free from cruel and unusual punishment prohibits enforcement of that law as applied to homeless individuals involuntarily sitting, lying, or sleeping on the street due to the unavailability of shelter in Los Angeles.
I. Facts and Procedural Background
The facts underlying this appeal are largely undisputed. Edward Jones, Patricia Vinson, George Vinson, Thomas Cash, Stanley Barger, and Robert Lee Purrie (“Appellants”) are homeless individuals who live on the streets of Los Angeles’s Skid Row district. Appellees are the City of Los Angeles, Los Angeles Police Department (“L.A.P.D.”) Chief William Brat-ton, and Captain Charles Beck (“Appellees” or “the City”). Federal law defines the term “homeless individual” to include
*1121 (1) an individual who lacks a fixed, regular, and adequate nighttime residence; and
(2) an individual who has a primary nighttime residence that is—
(A) a supervised publicly or privately operated shelter designed to provide temporary living accommodations (including welfare hotels, congregate shelters, and transitional housing for the mentally ill);
(B) an institution that provides a temporary residence for individuals intended to be institutionalized; or
(C) a public or private place not designed for, or ordinarily used as, a regular sleeping accommodation for human beings.
Stewart B. McKinney Homeless Assistance Act of 1987 § 103(a), 42 U.S.C. § 11302(a) (2000). Appellants are six of the more than 80,000 homeless individuals in Los Angeles County on any given night. See L.A. Homeless Servs. Auth., Los Angeles Continuum of Care, Exhibit 1 Narrative, at 2-17 (2001); see also Patrick Burns et al., Econ. Roundtable, Homeless in LA: A Working Paper for the 10-Year Plan To End Homelessness in Los Angeles County (2003) (estimating that more than 253,000 individuals were homeless in Los Angeles County at some point during 2002).
The term “Skid Row” derives from the lumber industry practice of building a road or track made of logs laid crosswise over which other logs were slid. Christine Ammer, The American Heritage Dictionary of Idioms 382 (paperback ed.2003). By the 1930s, the term was used to describe the area of town frequented by loggers and densely populated with bars and brothels. Id. Beginning around the end of the nineteenth century, the area now known as Los Angeles’s Skid Row became home to a transient population of seasonal laborers as residential hotels began to develop. See Mayor’s Citizens’ Task Force on Cent. City East, To Build a Community 5 (1988). For decades Skid Row has been home for “the down and out, the drifters, the unemployed, and the chronic alcoholic[s]” of Los Angeles. Id. Covering fifty city blocks immediately east of downtown Los Angeles, Skid Row is bordered by Third Street to the north, Seventh Street to the south, Alameda Street to the east, and Main Street to the west.
Los Angeles’s Skid Row has the highest concentration of homeless individuals in the United States. Charlie LeDuff, In Los Angeles, Skid Row Resists an Upgrade, N.Y. Times, July 15, 2003, at Al. According to the declaration of Michael Alvidrez, a manager of single-room-occupancy (“SRO”) hotels in Skid Row owned by the Skid Row Housing Trust, since the mid-1970s Los Angeles has chosen to centralize homeless services in Skid Row. See also Edward G. Goetz, Land Use and Homeless Policy in Los Angeles, 16 Int’l. J. Urb. & Regional Res. 540, 543 (1992) (discussing the City’s long-standing “policy of concentrating and containing the homeless in the Skid Row area”). The area is now largely comprised of SRO hotels (multiunit housing for very low income persons typically consisting of a single room with shared bathroom), shelters, and other facilities for the homeless.
Skid Row is a place of desperate poverty, drug use, and crime, where PortaPotties serve as sleeping quarters and houses of prostitution. Steve Lopez, A Comer Where L.A. Hits Rock Bottom, L.A. Times, Oct. 17, 2005, at Al. Recently, it has been reported that local hospitals and law enforcement agencies from nearby suburban areas have been caught “dumping” homeless individuals in Skid Row upon their release. Cara Mia DiMassa & Richard Winton, Dumping of Homeless Suspected Downtown, L.A. Times, Sept. 23, 2005, at Al. This led Los Angeles *1122 Mayor Antonio Villaraigosa to order an investigation into the phenomenon in September 2005. Cara Mia DiMassa & Richard Fausset, Mayor Orders Probe of Skid Row Dumping, L.A. Times, Sept. 27, 2005, at Bl. L.A.P.D. Chief William Bratton, insisting that the Department does not target the homeless but only people who violate city ordinances (presumably including the ordinance at issue), has stated:
“If the behavior is aberrant, in the sense that it breaks the law, then there are city ordinances.... You arrest them, prosecute them. Put them in jail. And if they do it again, you arrest them, prosecute them, and put them in jail. It’s that simple.”
Cara Mia DiMassa & Stuart Pfeifer, 2 Strategies on Policing Homeless, L.A. Times, Oct. 6, 2005, at A1 [hereinafter DiMassa, Policing Homeless ] (omission in original) (quoting Chief Bratton). This has not always been City policy. The ordinance at issue was adopted in 1968. See L.A., Cal., Ordinance 137,269 (Sept. 11, 1968). In the late 1980s, James K. Hahn, who served as Los Angeles City Attorney from 1985 to 2001 and subsequently as Mayor, refused to prosecute the homeless for sleeping in public unless the City provided them with an alternative to the streets. Frederick M. Muir, No Place Like Home: A Year After Camp Was Closed, Despair Still Reigns on Skid Row, L.A. Times, Sept. 25, 1988, § 2 (Metro), at 1.
For the approximately 11,000-12,000 homeless individuals in Skid Row, space is available in SRO hotels, shelters, and other temporary or transitional housing for only 9000 to 10,000, leaving more than 1000 people unable to find shelter each night. See Mayor’s Citizens’ Task Force, supra, at 5. In the County as a whole, there are almost 50,000 more homeless people than available beds. See L.A. Homeless Servs. Auth., supra, at 2-14. In 1999, the fair market rent for an SRO room in Los Angeles was $379 per month. L.A. Housing Crisis Task Force, In Short Supply 6 (2000). Yet the monthly welfare stipend for single adults in Los Angeles County is only $221. See L.A. Homeless Servs. Auth., supra, at 2-10. Wait-lists for public housing and for housing assistance vouchers in Los Angeles are three-to ten-years long. See The U.S. Conference of Mayors, A Status Report on Hunger and Homelessness in America’s Cities 101, 105 (2002) [hereinafter Homelessness Report];[1] L.A. Housing Crisis Task Force, supra, at 7.
The result, in City officials’ own words, is'that “ ‘[t]he gap between the homeless population needing a shelter bed and the inventory of shelter beds is severely large.’ ” Homelessness Report, supra, at 80. As Los Angeles’s homeless population has grown, see id. at 109 (estimating annualized growth of ten percent in Los Angeles’s homeless population in the years up to and including 2003), the availability of low-income housing in Skid Row has shrunk, according to the declaration of Alice Callaghan, director of a Skid Row community center and board member of the Skid Row Housing Trust. According to Callaghan’s declaration, at night in Skid Row, SRO hotels, shelters, and other temporary or transitional housing are the only alternatives to sleeping on the street; during the day, two small parks are open to *1123 the public. Thus, for many in Skid Row without the resources or luck to obtain shelter, sidewalks are the only place to be.
As will be discussed below, Appellants’ declarations demonstrate that they are not on the streets of Skid Row by informed choice. In addition, the Institute for the Study of Homelessness and Poverty reports that homelessness results from mental illness, substance abuse, domestic violence, low-paying jobs, and, most significantly, the chronic lack of affordable housing. Inst, for the Study of Homelessness and Poverty, “Who Is Homeless in Los Angeles?” 3 (2000). It also reports that between 33% and 50% of the homeless in Los Angeles are mentally ill, and 76% percent of homeless adults in 1990 had been employed for some or all of the two years prior to becoming homeless. Id. at 2; see also Grace R. Dyrness et ah, Crisis on the Streets: Homeless Women and Children in Los Angeles 14 (2003) (noting that approximately 14% of homeless individuals in Los Angeles are victims of domestic violence).
Against this background, the City asserts the constitutionality of enforcing Los Angeles Municipal Code section 41.18(d) against those involuntarily on the streets during nighttime hours, such as Appellants. It provides:
No person shall sit, lie or sleep in or upon any street, sidewalk or other public way.
The provisions of this subsection shall not apply to persons sitting on the curb portion of any sidewalk or street while attending or viewing any parade permitted under the provisions of Section 103.111 of Article 2, Chapter X of this Code; nor shall the provisions of this subsection supply [sic] to persons sitting upon benches or other seating facilities provided for such purpose by municipal authority by this Code.
L.A., Cal, MumCode § 41.18(d) (2005). A violation of section 41.18(d) is punishable by a fine of up to $1000 and/or imprisonment of up to six months. Id. § 11.00(m).
Section 41.18(d) is one of the most restrictive municipal laws regulating public spaces in the United States. The City can secure a conviction under the ordinance against anyone who merely sits, lies, or sleeps in a public way at any time of day. Other cities’ ordinances similarly directed at the homeless provide ways to avoid criminalizing the status of homelessness by making an element of the crime some conduct in combination with sitting, lying, or sleeping in a state of homelessness. For example, Las Vegas prohibits standing or lying in a public way only when it obstructs pedestrian or vehicular traffic. See, e.g., Las Vegas, Nev., Mun.Code § 10.47.020 (2005) (“It is unlawful to intentionally obstruct pedestrian or vehicular traffic----”). Others, such as Portland, prohibit “camping” in or upon any public property or public right of way. See, e.g., Portland, Or., Mun.Code §§ 14A.50.020, .030 (2006) (prohibiting obstruction of public sidewalks in a designated area or camping on public property). Still others contain safe harbor provisions such as limiting the hours of enforcement. See, e.g., Seattle, Wash., MumCode § 15.48.040 (2005) (“No person shall sit or lie down upon a public sidewalk ... during the hours between seven (7:00) a.m. and nine (9:00) p.m. in the following zones.... ”); Tucson, Ariz., MumCode § ll-36.2(a) (2005) (same, except prohibition extended to 10:00 p.m.); Houston, Tex., MumCode § 40-352(a) (2006) (same, except prohibition extended to 11:00 p.m.). Other cities include as a required element sitting, lying, or sleeping in clearly defined and limited zones. See, e.g., Philadelphia, Pa., MumCode § 10-611(l)(b)-(c), (2)(g)-(h) (2005) (prohibiting sitting or lying in certain designated zones only); Reno, Nev., MumCode § 8.12.015(b) *1124 (2005) (similar); Seattle, Wash., MumCode § 15.48.040 (similar). As a result of the expansive reach of section 41.18(d), the extreme lack of available shelter in Los Angeles, and the large homeless population, thousands of people violate the Los Angeles ordinance every day and night, and many are arrested, losing what few possessions they may have.[2] Appellants are among them.
Robert Lee Purrie is in his early sixties. He has lived in the Skid Row area for four decades. Purrie sleeps on the streets because he cannot afford a room in an SRO hotel and is often unable to find an open bed in a shelter. Early in the morning of December 5, 2002, Purrie declares that he was sleeping on the sidewalk at Sixth Street and Towne Avenue because he “had nowhere else to sleep.” At 5:20 a.m., L.A.P.D. officers cited Purrie for violating section 41.18(d). He could not afford to pay the resulting fine.
Purrie was sleeping in the same location on January 14, 2003, when police officers woke him early in the morning and searched, handcuffed, and arrested him pursuant to a warrant for failing to pay the fine from his earlier citation. The police removed his property from his tent, broke it down, and threw all of his property, including the tent, into the street. The officers also removed the property and tents of other homeless individuals sleeping near Purrie. After spending the night in jail, Purrie was convicted of violating section 41.18(d), given a twelve-month suspended sentence, and ordered to pay $195 in restitution and attorneys’ fees. Purrie was also ordered to stay away from the location of his arrest. Upon his release, Purrie returned to the corner where he had been sleeping on the night of his arrest to find that all the belongings he had left behind, including blankets, clothes, cooking utensils, a hygiene kit, and other personal effects, were gone.
Stanley Barger suffered a brain injury in a car accident in 1998 and subsequently lost his Social Security Disability Insurance. His total monthly income consists of food stamps and $221 in welfare payments. According to Barger’s declaration, he “want[sj to be off the street” but can only rarely afford shelter. At 5:00 a.m. on December 24, 2002, Barger was sleeping on the sidewalk at Sixth and Towne when L.A.P.D. officers arrested him. Barger was jailed, convicted of violating section 41.18(d), and sentenced to two days time served.
When Thomas Cash was cited for violating section 41.18(d), he had not worked for approximately two years since breaking his foot and losing his job, and had been sleeping on the street or in a Skid Row SRO hotel. Cash suffers from severe kidney problems, which cause swelling of his legs and shortness of breath, making it difficult for him to walk. At approximately noon on January 10, 2003, Cash tired as he walked to the SRO hotel where he was staying. He was resting on a tree stump when L.A.P.D. officers cited him.
Edward Jones’s wife, Janet, suffers serious physical and mental afflictions. Edward takes care of her, which limits his ability to find full-time work, though he has held various minimum wage jobs. The Joneses receive $375 per month from the Los Angeles County General Relief program, enabling them to stay in Skid Row SRO hotels for the first two weeks of each *1125 month. Because shelters separate men and women, and Janet’s disabilities require Edward to care for her, the Joneses are forced to sleep on the streets every month after their General Relief monies run out. At 6:30 a.m. on November 20, 2002, Edward and Janet Jones were sleeping on the sidewalk at the corner of Industrial and Alameda Streets when the L.A.P.D. cited them for violating section 41.18(d).
Patricia and George Vinson, a married couple, were looking for work and a permanent place to live when they were cited for violating section 41.18(d). They use their General Relief payments to stay in motels for part of every month and try to stay in shelters when their money runs out. On the night of December 2, 2002, they missed "a bus that would have taken them to a shelter and had to sleep on the sidewalk near the corner of Hope and Washington Streets instead. At 5:30 a.m. the next morning, L.A.P.D. officers cited the Vinsons for violating section 41.18(d).
The record before us includes declarations and supporting documentation from nearly four dozen other homeless individuals living in Skid Row who have been searched, ordered to move, cited, arrested, and/or prosecuted for, and in some cases convicted of, violating section 41.18(d). Many of these declarants lost much or all of their personal property when they were arrested.
On February 19, 2003, Appellants filed a complaint in the United States District Court for the Central District of California pursuant to 42 U.S.C. § 1983. They seek a permanent injunction against the City of Los Angeles and L.A.P.D. Chief William Bratton and Captain Charles Beck (in their official capacities), barring them from enforcing section 41.18(d) in Skid Row between the hours of 9:00 p.m. and 6:30 a.m. Appellants allege that by enforcing section 41.18(d) twenty-four hours a day against persons with nowhere else to sit, lie, or sleep, other than on public streets and sidewalks, the City is criminalizing the status of homelessness in violation of the Eighth and Fourteenth Amendments to the U.S. Constitution, and Article I, sections 7 and 17 of the California Constitution, see Cal. Const, art I, § 7 (guaranteeing due process and equal protection); id. § 17 (prohibiting cruel and unusual punishment). Appellants abandoned their second claim pursuant to 42 U.S.C. § 1983, alleging violations of a Fourteenth Amendment substantive due process right to treatment for chronic illnesses while in police custody, in the district court. On cross-motions for summary judgment, the district court granted judgment in favor of the City. Relying heavily on Joyce v. City and County of San Francisco, 846 F.Supp. 843 (N.D.Cal.1994), the district court held that enforcement of the ordinance does not violate the Eighth Amendment because it penalizes conduct, not status. This appeal timely followed.
II. Standard of Review
The parties dispute the appropriate standard of review. Appellants argue that the district court’s denial of summary judgment should be reviewed de novo, while the City argues that the abuse of discretion standard applies because the district court denied a request for equitable relief. Although we review a district court’s summary judgment order granting or denying a permanent injunction for abuse of discretion, Fortyune v. Am. Multi-Cinema, Inc., 364 F.3d 1075, 1079 (9th Cir.2004), we review any determination underlying the court’s decision under the standard applicable to that determination, United States v. Alisal Water Corp., 431 F.3d 643, 654 (9th Cir.2005). Therefore, we review de novo the district court’s legal determination that a statute is constitutional, United States v. Labrada-Bustamante, 428 F.3d 1252, 1262 (9th Cir.2005), *1126 and we review for clear error the district court’s findings of fact, Metropolitan Life Ins. Co. v. Parker, 436 F.3d 1109, 1113 (9th Cir.2006). We also review de novo the district court’s decision to grant or deny summary judgment. United States v. City of Tacoma, 332 F.3d 574, 578 (9th Cir.2003).
III. Discussion
A. Standing
The City challenges Appellants’ standing for the first time on appeal. We nevertheless consider this challenge because the question of standing is jurisdictional and may be raised at any time by the parties, Laub v. U.S. Dep’t of Interior, 342 F.3d 1080, 1085 (9th Cir.2003), or sua sponte, see RK Ventures, Inc. v. City of Seattle, 307 F.3d 1045, 1056 (9th Cir.2002) (raising issue of standing, but remanding for further development of the record). We conclude that Appellants have standing to bring this action.
The City’s contention that standing requires Appellants to have been convicted under the ordinance ignores established standing principles. The City also argues Appellants lack standing because, after being arrested, jailed, and losing their belongings, Appellants could theoretically raise a necessity defense if they were prosecuted. This argument is legally, factually, and realistically untenable.[3]
Article III of the Constitution requires a plaintiff seeking to invoke the jurisdiction of the federal courts to allege an actual case or controversy. To satisfy the case or controversy requirement, the party invoking a court’s jurisdiction must “show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant, and that the injury fairly can be traced to the challenged action and is likely to be redressed by a favorable decision.” Valley Forge Christian Coll. v. Ams. United for Separation of Church and State, Inc., 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982) (citation and internal quotation marks omitted). In a suit for prospective injunctive relief, a plaintiff is required to demonstrate a real and immediate threat of future injury. City of Los Angeles v. Lyons, 461 U.S. 95, 101-02, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (holding that the threat must be “ ‘real and immediate’ ” as opposed to “ ‘conjectural’ or ‘hypothetical’ ”). The key issue is whether the plaintiff is “likely to suffer future injury.” Id. at 105, 103 S.Ct. 1660; see also O’Shea v. Littleton, 414 U.S. 488, 496, 498, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974).
 Where the plaintiff seeks to enjoin criminal law enforcement activities against him, standing depends on the plaintiffs ability to avoid engaging in the illegal conduct in the future. See Hodgers-Durgin v. de la Vina, 199 F.3d 1037, *1127 1041 (9th Cir.1999) (en banc) (citing Spencer v. Kemna, 523 U.S. 1, 15, 118 S.Ct. 978, 140 L.Ed.2d 43 (1998)). The plaintiff need only establish that there is a reasonable expectation that his conduct will recur, triggering the alleged harm; he need not show that such recurrence is probable. See Honig v. Doe, 484 U.S. 305, 318 & n. 6, 108 S.Ct. 592, 98 L.Ed.2d 686 (1988); id. at 320, 108 S.Ct. 592 (distinguishing, inter alia, Lyons, 461 U.S. at 105-06, 103 S.Ct. 1660). Avoiding illegal conduct may be impossible when the underlying criminal statute is unconstitutional. See O’Shea, 414 U.S. at 496, 94 S.Ct. 669 (noting that plaintiffs may have had standing had they alleged that the laws under which they feared prosecution in the future were unconstitutional); Perez v. Ledesma, 401 U.S. 82, 101-02, 91 S.Ct. 674, 27 L.Ed.2d 701 (1971) (Brennan, J., concurring in part and dissenting in part) (noting prior aggressive prosecution under an allegedly unconstitutional law as a factor for finding sufficient controversy for declaratory relief). Past exposure to allegedly unlawful state action, while not alone sufficient to establish a present case or controversy, is “evidence bearing on whether there is a real and immediate threat of repeated injury.” Lyons, 461 U.S. at 102, 103 S.Ct. 1660 (internal quotation marks omitted).
Appellants seek only prospective injunctive relief, not damages. They do not ask for section 41.18(d) to be declared facially unconstitutional; they seek only to have its enforcement enjoined in a small area of the city during nighttime hours. Appellants have demonstrated both past injuries and a real and immediate threat of future injury: namely, they have been and are likely to be fined, arrested, incarcerated, prosecuted, and/or convicted for involuntarily violating section 41.18(d) at night in Skid Row. These law enforcement actions restrict Appellants’ personal liberty, deprive them of property, and cause them to suffer shame and stigma. In the absence of any indication that the enormous gap between the number of available beds and the number of homeless individuals in Los Angeles generally and Skid Row in particular has closed, Appellants are certain to continue sitting, lying, and sleeping in public thoroughfares and, as a result, will suffer direct and irreparable injury from enforcement of section 41.18(d). As L.A.P.D. Chief Bratton has promised, they will be arrested, prosecuted, and put in jail repeatedly, if necessary. See DiMassa, Policing Homeless, supra. Appellants have therefore alleged an actual case or controversy and have standing to bring this suit.
In arguing that Appellants lack standing, the City misrelies upon dicta in Ingraham v. Wright, 430 U.S. 651, 97 S.Ct. 1401, 51 L.Ed.2d 711 (1977), for the proposition that the Cruel and Unusual Punishment Clause attaches only postconviction. It contends that Appellants have suffered a constitutionally cognizable harm only if they have been convicted and/or face an imminent threat of future conviction. The City asserts that Appellants have not adequately demonstrated that they have been convicted and/or are likely to be convicted in the future under section 41.18(d).
Ingraham addressed a claim that the Cruel and Unusual Punishment Clause bars the use of disciplinary corporal punishment in public schools. Id. at 668, 97 S.Ct. 1401. The Court explained that the Clause places three distinct limits on the state’s criminal law powers:
First, it limits the kinds of punishment that can be imposed on those convicted of crimes; second, it proscribes punishment grossly disproportionate to the severity of the crime; and third, it imposes substantive limits on what can be made criminal and punished as such.
Id. at 667, 97 S.Ct. 1401 (citations omitted). Reviewing the history of the Eighth *1128 Amendment, the Ingraham Court concluded that the Clause does not regulate state action “outside the criminal process.” Id. at 667-68, 97 S.Ct. 1401. It reasoned that because the context of disciplining schoolchildren is “wholly different” from that of punishing criminals, disciplinary corporal punishment is not subject to Eighth Amendment scrutiny. Id. at 669-71, 97 S.Ct. 1401.
Ingraham rests on the distinction between state action inside and “outside the criminal process,” id. at 667, 97 S.Ct. 1401, not on any distinction between criminal convictions and preconviction law enforcement measures such as arrest, jailing, and prosecution. See id. at 686, 97 S.Ct. 1401 (White, J., dissenting) (explaining that the Court’s reasoning depends on the “distinction between criminal and noncriminal punishment”). Thus, contrary to the City’s and the dissent’s argument, Ingraham does not establish that the Cruel and Unusual Punishment Clause only attaches postconviction. In fact, the Ingraham decision expressly recognizes that the Clause “imposes substantive limits on what can be made criminal,” id. at 667, 97 S.Ct. 1401 (Powell, J., majority opinion), a protection that attaches before conviction, and the very one Appellants seek in this case.
The City and the dissent advance out of context the following dicta from Ingraham to support their contention that a conviction is necessary before one has standing to invoke our jurisdiction: “[the Cruel and Unusual Punishment Clause] was designed to protect those convicted of crimes,” id. at 664, 97 S.Ct. 1401; and “the State does not acquire the power to punish with which the. Eighth Amendment is concerned until after it has secured a formal adjudication of guilt in accordance with due process of law,” id. at 671 n. 40, 97 S.Ct. 1401. However, that language is relevant only to the first two of the three circumscriptions on the criminal process identified by the Ingraham Court: limits on the kind and proportionality of punishment permissible postconviction. That language is inapplicable when the challenge is based on the third category of limitations, “on what can be made criminal and punished as such.” Id. at 667, 97 S.Ct. 1401.
The Clause’s first two protections govern the particulars of criminal punishment, “what kind” and “how much,” covering only those who have been convicted of a criminal violation and face punitive sanctions. A plaintiff alleging violations of the first or second protections, therefore, has not suffered constitutionally cognizable harm unless he has been convicted. See, e.g., City of Revere v. Mass. Gen. Hosp., 463 U.S. 239, 243-44, 103 S.Ct. 2979, 77 L.Ed.2d 605 (1983) (holding that the Eighth Amendment does not apply to a claim involving deliberate indifference by government officials to the medical needs of an injured suspect before his arrest). Thus, in Hawkins v. Comparet-Cassani, we relied upon the above Ingraham dicta in holding that plaintiffs who had not been convicted lacked standing under the Eighth Amendment to challenge the use of electric stun belts during court proceedings, a claim that arose under the first two protections of the Clause. 251 F.3d 1230, 1238 (9th Cir.2001).
The Cruel and Unusual Punishment Clause’s third protection, however, differs from the first two in that it limits what the state can criminalize, not how it can punish. See Ingraham, 430 U.S. at 667, 97 S.Ct. 1401. This protection governs the criminal law process as a whole, not only the imposition of punishment postconviction. See, e.g., Robinson v. California, 370 U.S. 660, 666, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (“[A] law which made a criminal offense of ... a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment ....”); see *1129 also Ingraham, 430 U.S. at 664, 666, 97 S.Ct. 1401 (explaining that the Eighth Amendment concerns “the criminal process” and seeks “to limit the power of those entrusted with the criminal-law function of government”). If the state transgresses this limit, a person suffers constitutionally cognizable harm as soon as he is subjected to the criminal process. This may begin well before conviction: at arrest, see, e.g., McNabb v. United States, 318 U.S. 332, 343-44, 63 S.Ct. 608, 87 L.Ed. 819 (1943) (the requirement “that the police must with reasonable promptness show legal cause for detaining arrested persons” is part of the “process of criminal justice”); at citation, see, e.g., Rosario v. Amalgamated Ladies’ Garment Cutters’ Union, Local 10, I.L.G.W.U., 605 F.2d 1228, 1249-50 (2d Cir.1979) (issuance by the police of an “Appearance Ticket” compelling an individual to appear in court commenced the criminal process); or even earlier, see Dickey v. Florida, 398 U.S. 30, 43, 90 S.Ct. 1564, 26 L.Ed.2d 26 (1970) (the criminal process may begin pre-arrest, as soon as the state decides to prosecute an individual and amasses evidence against him).
A more restrictive approach to standing, one that made conviction a prerequisite for any type of Cruel and Unusual Punishment Clause challenge, would allow the state to criminalize a protected behavior or condition and cite, arrest, jail, and even prosecute individuals for violations, so long as no conviction resulted. Under this approach, the state could in effect punish individuals in the preconviction stages of the criminal law enforcement process for being or doing things that under the Clause cannot be subject to the criminal process. But the Clause’s third protection limits the state’s ability to criminalize certain behaviors or conditions, not merely its ability to convict and then punish post conviction.
Accordingly, to bring an as-applied challenge to a criminal statute alleged to transgress the Clause’s substantive limits on criminalization, all that is required for standing is some direct injury — for example, a deprivation of property, such as a fine, or a deprivation of liberty, such as an arrest — resulting from the plaintiffs subjection to the criminal process due to violating the statute. Cf. Lyons, 461 U.S. at 101-02, 103 S.Ct. 1660 (standing requires a direct injury). At least one other court hearing a challenge by homeless plaintiffs to municipal ordinances alleged to violate the Clause’s substantive limits on criminalization has recognized this principle. See Joyce, 846 F.Supp. at 853-54 (noting that an attempt to read Ingraham to restrict Eighth Amendment standing to those convicted of crimes “is refuted by the express language of Ingraham,” and holding that the fact that one of the plaintiffs had been cited and paid a fine “suffice[d] to invoke consideration of the Eighth Amendment”). Other courts likewise appear to have reached the merits of similar suits where homeless plaintiffs had not suffered convictions. See Church v. City of Huntsville, 30 F.3d 1332, 1339 (11th Cir.1994) (opinion suggests but does not state that plaintiffs had not suffered convictions); Pottinger v. City of Miami, 810 F.Supp. 1551, 1559-60 (S.D.Fla.1992) (same), remanded for limited purposes, 40 F.3d 1155 (11th Cir.1994).
Notwithstanding this well-established Supreme Court authority, the City urges us to follow the Fifth Circuit, which has based its rejection of an Eighth Amendment challenge by homeless persons on the absence of a conviction. See Johnson v. City of Dallas, 61 F.3d 442, 443-45 (5th Cir.1995). There, the district court had found that there was insufficient shelter in Dallas and enjoined enforcement of an ordinance prohibiting sleeping in public against homeless individuals with no other place to be. Johnson v. City of Dallas, *1130 860 F.Supp. 344, 350 (N.D.Tex.1994), rev’d on standing grounds, 61 F.3d 442. Plaintiffs had been ticketed for violating the ordinance but none had been convicted. Johnson, 61 F.3d at 444. The Fifth Circuit reversed, reasoning that the very dicta from Ingraham that the City now relies on required a conviction for standing. Id. at 444-45. In focusing on this lack of a conviction, the Fifth Circuit, the City, and the dissent all fail to recognize the distinction between the Cruel and Unusual Punishment Clause’s first two protections and its third. Moreover, they ignore the imminent threat of conviction and the evidence of actual convictions presented here.
Although a conviction is not required to establish standing for prospective relief from enforcement of a criminal law against a status or behavior that may not be criminalized under the Eighth Amendment, here, two of the six Appellants, Purrie and Barger, have in fact been convicted and sentenced for violating section 41.18(d). Documents in the record demonstrate that judgment was pronounced and Barger was sentenced by the Los Angeles County Superior Court to time served on December 26, 2002. Similarly, judgment was pronounced and Purrie was given a twelvemonth suspended sentence on January 15, 2003 with the condition that he “stay away from location of arrest.” [4] If a conviction is constitutionally required, the fact that two of the six plaintiffs were convicted suffices'to establish standing for all. See Leonard v. Clark, 12 F.3d 885, 888 (9th Cir.1993), as amended. Thus the City’s argument that Appellants lack standing because a conviction is required fails on the facts as well as the law.
The City next argues that Appellants lack standing because they could assert a necessity defense. In support of this argument, the City relies on In re Eichorn, 69 Cal.App.4th 382, 81 Cal.Rptr.2d 535, 539-40 (1998), in which the California Court of Appeal held that a homeless defendant may raise a necessity defense to violation of a municipal anti-camping ordinance. This argument also lacks merit.
A criminal defendant may assert a necessity defense if he has committed an offense to prevent an imminent harm that he could not have otherwise prevented. E.g., United States v. Arellano-Rivera, 244 F.3d 1119, 1125 (9th Cir.2001). Under California law, a court must instruct the jury on the necessity defense if there is
evidence sufficient to establish that defendant violated the law (1) to prevent a *1131 significant evil, (2) with no adequate alternative, (3) without creating a greater danger than the one avoided, (4) with a good faith belief in the necessity, (5) with such belief being objectively reasonable, and (6) under circumstances in which he did not substantially contribute to the emergency.
People v. Pepper, 41 Cal.App.4th 1029, 48 Cal.Rptr.2d 877, 880 (1996).
It is undisputed, however, that Appellants have been and in the future will probably be fined, arrested, imprisoned, and/or prosecuted, as well as suffer the loss of their personal property, for involuntarily violating section 41.18(d). These preconviction harms, some of which occur immediately upon citation or arrest, suffice to establish standing and are not salved by the potential availability of a necessity defense. The loss of Appellants’ possessions when they are arrested and held in custody is particularly injurious because they have so few resources and may find that everything they own has disappeared by the time they return to the street.
Moreover, the practical realities of homelessness make the necessity defense a false promise for those charged with violating section 41.18(d). Homeless individuals, who may suffer from mental illness, substance abuse problems, unemployment, and poverty, are unlikely to have the knowledge or resources to assert a necessity defense to a section 41.18(d) charge, much less to have access to counsel when they are arrested and arraigned. Furthermore, even counseled homeless individuals are unlikely to subject themselves to further jail time and a trial when they can plead guilty in return for a sentence of time served and immediate release. Finally, one must question the policy of arresting, jailing, and prosecuting individuals whom the City Attorney concedes cannot be convicted due to a necessity defense. If there is no offense for which the homeless can be convicted, is the City admitting that all that comes before is merely police harassment of a vulnerable population?
B. The Eighth Amendment Prohibition on Cruel and Unusual Punishment
The district court erred by not engaging in a more thorough analysis of Eighth Amendment jurisprudence under Robinson v. California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962), and Powell v. Texas, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968), when it held that the only relevant inquiry is whether the ordinance at issue punishes status as opposed to conduct, and that homelessness is not a constitutionally cognizable status.
The district court relied exclusively on the analysis of Robinson and Powell by another district court in Joyce v. City and County of San Francisco, in which plaintiffs challenged certain aspects of San Francisco’s comprehensive homelessness program on Eighth Amendment grounds. 846 F.Supp. 843 (N.D.Cal.1994). Joyce, however, was based on a very different factual underpinning than is present here. Called the “Matrix Program,” the homelessness program was “ ‘an interdepartmental effort ... [utilizing] social workers and health workers ... [and] offering shelter, medical care, information about services and general assistance.’ ” Id. at 847 (alterations and omissions in original). One element of the program consisted of the “Night Shelter Referral” program conducted by the Police Department, which handed out “referrals” to temporary shelters. Id. at 848. The City demonstrated that of 3820 referral slips offered to men, only 1866 were taken and only 678 used. Id.
The Joyce plaintiffs made only the conclusory allegation that there was insufficient shelter, id. at 849; they did not make *1132 the strong evidentiary showing of a substantial shortage of shelter Appellants make here. Moreover, the preliminary injunction plaintiffs sought in Joyce was so broad as to enjoin enforcement of prohibitions on camping or lodging in public parks and on “ ‘life-sustaining activities such as sleeping, sitting or remaining in a public place,’ ” which might also include such antisocial conduct as public urination and aggressive panhandling. Id. at 851 (emphasis added). Reasoning that plaintiffs’ requested injunction was too broad and too difficult to enforce, and noting the preliminary nature of its findings based on the record at an early stage in the proceedings, the district court denied the injunction. Id. at 851-53. The Joyce court also concluded that homelessness was not a status protectable under the Eighth Amendment, holding that it was merely a constitutionally noncognizable “condition.” Id. at 857-58.
We disagree with the analysis of Robinson and Powell conducted by both the district court in Joyce and the district court in the case at bar. The City could not expressly criminalize the status of homelessness by making it a crime to be homeless without violating the Eighth Amendment, nor can it criminalize acts that are an integral aspect of that status. Because there is substantial and undisputed evidence that the number of homeless persons in Los Angeles far exceeds the number of available shelter beds at all times, including on the nights of their arrest or citation, Los Angeles has encroached upon Appellants’ Eighth Amendment protections by criminalizing the unavoidable act of sitting, lying, or sleeping at night while being involuntarily homeless. A closer analysis of Robinson and Powell instructs that the involuntariness of the act or condition the City criminalizes is the critical factor delineating a constitutionally cognizable status, and incidental conduct which is integral to and an unavoidable result of that status, from acts or conditions that can be criminalized consistent with the Eighth Amendment.
Our analysis begins with Robinson, which announced limits on what the state can criminalize consistent with the Eighth Amendment. In Robinson, the Supreme Court considered whether a state may convict an individual for violating a statute making it a criminal offense to “ ‘be addicted to the use of narcotics.’ ” 370 U.S. at 660, 82 S.Ct. 1417 (quoting Cal. Health & Safety Code § 11721). The trial judge had instructed the jury that
“[t]o be addicted to the use of narcotics is said to be a status or condition and not an act. It is a continuing offense and differs from most other offenses in the fact that [it] is chronic rather than acute; that it continues after it is complete and subjects the offender to arrest at any time before he reforms.... All that the People must show is ... that while in the City of Los Angeles [Robinson] was addicted to the use of narcotics....”
Id. at 662-63, 82 S.Ct. 1417 (second alteration and third omission in original). The Supreme Court reversed Robinson’s conviction, reasoning:
It is unlikely that any State at this moment in history would attempt to make it a criminal offense for a person to be mentally ill, or a leper, or to be afflicted with a venereal disease.... [I]n the light of contemporary human knowledge, a law which made a criminal offense of such a disease would doubtless be universally thought to be an infliction of cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments.
We cannot but consider the statute before us as of the same category. In this Court counsel for the State recognized that narcotic addiction is an ill *1133 ness. Indeed, it is apparently an illness which may be contracted innocently or involuntarily. We hold that a state law which imprisons a person thus afflicted as a criminal, even though he has never touched any narcotic drug within the State or been guilty of any irregular behavior there, inflicts a cruel and unusual punishment in violation of the Fourteenth Amendment.
Id. at 666-67, 82 S.Ct. 1417 (citation and footnotes omitted).
The Court did not articulate the principles that undergird its holding. At a minimum, Robinson establishes that the state may not criminalize “being”; that is, the state may not punish a person for who he is, independent of anything he has done. See, e.g., Powell, 392 U.S. at 533, 88 S.Ct. 2145 (Marshall, J., plurality opinion) (stating that Robinson requires an actus reus before the state may punish). However, as five Justices would later make clear in Powell, Robinson also supports the principle that the state cannot punish a person for certain conditions, either arising from his own acts or contracted involuntarily, or acts that he is powerless to avoid. Powell, 392 U.S. at 567, 88 S.Ct. 2145 (Fortas, J., dissenting) (endorsing this reading of Robinson); id. at 550 n. 2, 88 S.Ct. 2145 (White, J., concurring in the judgment) (same, but only where acts predicate to the condition are remote in time); see Robinson, 370 U.S. at 666-67, 82 S.Ct. 1417 (stating that punishing a person for having a venereal disease would be unconstitutional, and noting that drug addiction “may be contracted innocently or involuntarily”).
Six years after its decision in Robinson, the Supreme Court considered the case of Leroy Powell, who had been charged with violating a Texas statute making it a crime to “ ‘get drunk or be found in a state of intoxication in any public place.’ ” Powell, 392 U.S. at 517, 88 S.Ct. 2145 (Marshall, J., plurality opinion) (quoting Tex. Penal Code Ann. art. 477 (Vernon 1952)). The trial court found that Powell suffered from the disease of chronic alcoholism, which “ ‘destroys the afflicted person’s will’ ” to resist drinking and leads him to appear drunk in public involuntarily. Id. at 521, 88 S.Ct. 2145. Nevertheless, the trial court summarily rejected Powell’s constitutional defense and found him guilty. See id. at 558, 88 S.Ct. 2145 (Fortas, J., dissenting). On appeal to the United States Supreme Court, Powell argued that the Eighth Amendment prohibited “punish[ing] an ill person for conduct over which he has no control.” Brief for Appellant at 6, Powell, 392 U.S. 514, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (No. 405), 1967 WL 113841.
In a 4-1-A decision, the Court affirmed Powell’s conviction. The four Justices joining the plurality opinion interpreted Robinson to prohibit only the criminalization of pure status and not to limit the criminalization of conduct. Powell, 392 U.S. at 533, 88 S.Ct. 2145 (Marshall, J., plurality opinion). The plurality then declined to extend the Cruel and Unusual Punishment Clause’s protections to any involuntary conduct, citing slippery slope concerns, id. at 534-35, 88 S.Ct. 2145, and considerations of federalism and personal accountability, id. at 535-36, 88 S.Ct. 2145. Because Powell was convicted not for his status as a chronic alcoholic, but rather for his acts of becoming intoxicated and appearing in public, the Potuell plurality concluded that the Clause as interpreted by Robinson did not protect him. Id. at 532, 88 S.Ct. 2145.
In contrast, the four Justices in dissent read Robinson to stand for the proposition that “[cjriminal penalties may not be inflicted on a person for being in a condition he is powerless to change.” Id. at 567, 88 S.Ct. 2145 (Fortas, J., dissenting). Applying Robinson to the facts of Powell’s case, the dissenters first described the predicate *1134 for Powell’s conviction as “the mere condition of being intoxicated in public” rather than any “acts," such as getting drunk and appearing in public. Id. at 559, 88 S.Ct. 2145. Next and more significantly, the dissenters addressed the involuntariness of Powell’s behavior, noting that Powell had “ ‘an uncontrollable compulsion to drink’ to the point of intoxication; and that, once intoxicated, he could not prevent himself from appearing in public places.” Id. at 568, 88 S.Ct. 2145. Having found that the Cruel and Unusual Punishment Clause, as interpreted by Robinson, protects against the criminalization of being in a condition on? is powerless to avoid, see id. at 567, 88 S.Ct. 2145, and because Powell was powerless to avoid public drunkenness, the dissenters concluded that his conviction should be reversed, see id. at 569-70, 88 S.Ct. 2145.
In his separate opinion, Justice White rejected the plurality’s proposed status-conduct distinction, finding it similar to “forbidding criminal conviction for being sick with flu or epilepsy but permitting punishment for running a fever or having a convulsion.” Id. at 548-49, 88 S.Ct. 2145 (White, J., concurring in the judgment). Justice White read Robinson to stand for the principle that “it cannot be a crime to have an irresistible compulsion to use narcotics,” id. at 548, 88 S.Ct. 2145, and concluded that “[t]he proper subject of inquiry is whether volitional acts [sufficiently proximate to the condition] brought about the” criminalized conduct or condition, id. at 550 n. 2, 88 S.Ct. 2145.
Justice White concluded that given the holding in Robinson, “the chronic alcoholic with an irresistible urge to consume alcohol should not be punishable for drinking or being drunk.” Id. at 549, 88 S.Ct. 2145. For those chronic alcoholics who lack homes,
a showing could be made that resisting drunkenness is impossible and that avoiding public places when intoxicated is also impossible. As applied to them this statute is in effect a law which bans a single act for which they may not be convicted under the Eighth Amendment — the act of getting drunk.
Id. at 551, 88 S.Ct. 2145. This position is consistent with that of the Powell dissenters, who quoted and agreed with Justice White’s standard, see id. at 568 n. 31, 88 S.Ct. 2145 (Fortas, J., dissenting), and stated that Powell’s conviction should be reversed because his public drunkenness was involuntary, id. at 570, 88 S.Ct. 2145.
Justice White’s Powell opinion also echoes his prior dissent in Robinson. In Robinson, Justice White found no Eighth Amendment violation for two reasons: First, because he did “not consider [Robinson’s] conviction to be a punishment for having an illness or for simply being in some status or condition, but rather a conviction for the regular, repeated or habitual use of narcotics immediately prior to his arrest,” Robinson, 370 U.S. at 686, 82 S.Ct. 1417 & nn. 2-3 (White, J., dissenting) (discussing jury instructions regarding addiction and substantial evidence of Robinson’s frequent narcotics use in the days prior to his arrest); and second, and most importantly, for understanding his opinion in Powell, because the record did not suggest that Robinson’s drug addiction was involuntary, see id. at 685, 82 S.Ct. 1417. According to Justice White, “if [Robinson] was convicted for being an addict who had lost his power of self-control, I would have other thoughts about this case.” Id.
Justice White and the Powell dissenters shared a common view of the importance of involuntariness to the Eighth Amendment inquiry. They differed only on two issues. First, unlike the dissenters, Justice White believed Powell had not demonstrated that his public drunkenness was *1135 involuntary. Compare Powell, 392 U.S. at 553, 88 S.Ct. 2145 (White, J., concurring in the judgment) (“[NJothing in the record indicates that [Powell] could not have done his drinking in private.... Powell had a home and wife, and if there were reasons why he had to drink in public or be drunk there, they do not appear in the record.”), ■with id. at 568 n. 31, 88 S.Ct. 2145 (Fortas, J., dissenting) (“I believe these findings must fairly be read to encompass facts that my Brother White agrees would require reversal, that is, that for appellant Powell, ‘resisting drunkenness’ and ‘avoiding public places when intoxicated’ on the occasion in question were ‘impossible.’ ”).
Second, Justice White rejected the dissent’s attempt to distinguish conditions from acts for Eighth Amendment pm> poses. See id. at 550 n. 2, 88 S.Ct. 2145 (White, J., concurring in the judgment). We agree with Justice White that analysis of the Eighth Amendment’s substantive limits on criminalization “is not advanced by preoccupation with the label ‘condition.’ ” Id. One could define many acts as being in the condition of engaging in those acts, for example, the act of sleeping on the sidewalk is indistinguishable from the condition of being asleep on the sidewalk. “ ‘Being’ drunk in public is not far removed in time from the acts of ‘getting[1] drunk and ‘going’ into public,” and there is no meaningful “line between the man who appears in public drunk and that same man five minutes later who is then ‘being’ drunk in public.” Id. The dissenters themselves undermine their proposed distinction by suggesting that criminalizing involuntary acts that “typically flow from ... the disease of chronic alcoholism” would violate the Eighth Amendment, as well as by stating that “[i]f an alcoholic should be convicted for criminal conduct which is not a characteristic and involuntary part of the pattern of the disease as it afflicts him, nothing herein would prevent his punishment.” Id. at 559 n. 2, 88 S.Ct. 2145 (Fortas, J., dissenting) (emphasis added).
Notwithstanding these differences, five Justices in Powell understood Robinson to stand for the proposition that the Eighth Amendment prohibits the state from punishing an involuntary act or condition if it is the unavoidable consequence of one’s status or being. See id. at 548, 550 n. 2, 551, 88 S.Ct. 2145 (White, J., concurring in the judgment); id. at 567, 88 S.Ct. 2145 (Fortas, J., dissenting); see also Robert L. Misner, The New Attempt Laws: Unsuspected Threat to the Fourth Amendment, 33 Stan. L.Rev. 201, 219 (1981) (“[T]he consensus [of White and the dissenters apparently] was that an involuntary act does not suffice for criminal liability.”). Although this principle did not determine the outcome in Powell, it garnered the considered support of a majority of the Court. Because the conclusion that certain involuntary acts could not be criminalized was not dicta, see United States v. Johnson, 256 F.3d 895, 915, 914-16 (9th Cir.2001) (en banc) (Kozinski, J., concurring) (narrowly defining dicta as “a statement [that] is made casually and without analysis, ... uttered in passing without due consideration of the alternatives, or ... merely a prelude to another legal issue that commands” the court’s full attention), we adopt this interpretation of Robinson and the Cruel and Unusual Punishment Clause as persuasive authority. We also note that in the absence of any agreement between Justice Wdiite and the plurality on the meaning of Robinson and the commands of the Cruel and Unusual Punishment Clause, the precedential value of the Poivell plurality opinion is limited to its precise facts. “When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments *1136 on the narrowest grounds.... ” Marks v. United States, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977) (omission in original) (internal quotation marks omitted); see also Kent Greenawalt, “Uncontrollable” Actions and the Eighth Amendment: Implications of Powell v. Texas, 69 Colum. L.Rev. 927, 931 (1969) (“[T]he dissent comes closer to speaking for a majority of the Court than does the plurality opinion.”).
Following Robinson’s holding that the state cannot criminalize pure status, and the agreement of five Justices in Powell that the state cannot criminalize certain involuntary conduct, there are two considerations relevant to defining the Cruel and Unusual Punishment Clause’s limits on the state’s power to criminalize. The first is the distinction between pure status — the state of being — and pure conduct — the act of doing. The second is the distinction between an involuntary act or condition and a voluntary one. Accordingly, in determining whether the state may punish a particular involuntary act or condition, we are guided by Justice White’s admonition that “[t]he proper subject of inquiry is whether volitional acts brought about the ‘condition’ and whether those acts are sufficiently proximate to the ‘condition’ for it to be permissible to impose penal sanctions on the ‘condition.’ ” Powell, 392 U.S. at 550 n. 2, 88 S.Ct. 2145 (White, J., concurring in the judgment); see also Bowers v. Hardwick, 478 U.S. 186, 202 n. 2, 106 S.Ct. 2841, 92 L.Ed.2d 140 (1986) (Black-mun, J., dissenting) (quoting and endorsing this statement in discussing whether the Eighth Amendment limits the state’s ability to criminalize homosexual acts).
The Robinson and Powell decisions, read together, compel us to conclude that enforcement of section 41.18(d) at all times and in all places against homeless individuals who are sitting, lying, or sleeping in Los Angeles’s Skid Row because they cannot obtain shelter violates the Cruel and Unusual Punishment Clause. As homeless individuals, Appellants are in a chronic state that may have been acquired “innocently or involuntarily.” Robinson, 370 U.S. at 667, 82 S.Ct. 1417. Whether sitting, lying, and sleeping are defined as acts or conditions, they are universal and unavoidable consequences of being human. It is undisputed that, for homeless individuals in Skid Row who have no access to private spaces, these acts can only be done in public. In contrast to Leroy Powell, Appellants have made a substantial showing that they are “unable to stay off the streets on the night[s] in question.” Powell, 392 U.S. at 554, 88 S.Ct. 2145 (White, J., concurring in the judgment).
In disputing our holding, the dissent veers off track by attempting to isolate the supposed “criminal conduct” from the status of being involuntarily homeless at night on the streets of Skid Row. Unlike the cases the dissent relies on, which involve failure to carry immigration documents, illegal reentry, and drug dealing, the conduct at issue here is involuntary and inseparable from status — they are one and the same, given that human beings are biologically compelled to rest, whether by sitting, lying, or sleeping. The cases the dissent cites do not control our reading of Robinson and Powell where, as here, an Eighth Amendment challenge concerns the involuntariness of a criminalized act or condition inseparable from status. See Johnson, 256 F.3d at 915 (“Where it is clear that a statement ... is uttered in passing without due consideration of the alternatives, ... it may be appropriate to re-visit the issue in a later case.”). The City and the dissent apparently believe that Appellants can avoid sitting, lying, and sleeping for days, weeks, or months at a time to comply with the City’s ordinance, as if human beings could remain in perpetual motion. That being an impossibility, *1137 by criminalizing sitting, lying, and sleeping, the City is in fact criminalizing Appellants’ status as homeless individuals.
Similarly, applying Robinson and Powell, courts have found statutes criminalizing the status of vagrancy to be unconstitutional. For example, Goldman v. Kneckt declared unconstitutional a Colorado statute making it a crime for “ ‘[a]ny person able to work and support himself ” to “ ‘be found loitering or strolling about, frequenting public places, ... begging or leading an idle, immoral or profligate course of life, or not having any visible means of support.’ ” 295 F.Supp. 897, 899 n. 2, 908 (D.Colo.1969) (three-judge court); see also Wheeler v. Goodman, 306 F.Supp. 58, 59 n. 1, 62, 66 (W.D.N.C.1969) (three-judge court) (striking down as unconstitutional under Robinson a statute making it a crime to, inter alia, be able to work but have no property or “ ‘visible and known means’ ” of earning a livelihood), vacated on other grounds, 401 U.S. 987, 91 S.Ct. 1219, 28 L.Ed.2d 524 (1971). These cases establish that the state may not make it an offense to be idle, indigent, or homeless in public places. Nor may the state criminalize conduct that is an unavoidable consequence of being homeless — namely sitting, lying, or sleeping on the streets of Los Angeles’s Skid Row. As Justice White stated in Poivell, “[p]unishing an addict for using drugs convicts for addiction under a different name.” 392 U.S. at 548, 88 S.Ct. 2145 (White, J., concurring in the judgment).
IV. Conclusion
Homelessness is not an innate or immutable characteristic, nor is it a disease, such as drug addiction or alcoholism. But generally one cannot become a drug addict or alcoholic, as those terms are commonly used, without engaging in at least some voluntary acts (taking drugs, drinking alcohol). Similarly, an individual may become homeless based on factors both within and beyond his immediate control, especially in consideration of the composition of the homeless as a group: the mentally ill, addicts, victims of domestic violence, the unemployed, and the unemployable. That Appellants may obtain shelter on some nights and may eventually escape from homelessness does not render their status at the time of arrest any less worthy of protection than a drug addict’s or an alcoholic’s.
Undisputed evidence in the record establishes that at the time they were cited or arrested, Appellants had no choice other than to be on the streets. Even if Appellants’ past volitional acts contributed to their current need to sit, lie, and sleep on public sidewalks at night, those acts are not sufficiently proximate to the conduct at issue here for the imposition of penal sanctions to be permissible. See Powell v. Texas, 392 U.S. 514, 550 n. 2, 88 S.Ct. 2145, 20 L.Ed.2d 1254 (1968) (White, J„ concurring in the judgment). In contrast, we find no Eighth Amendment protection for conduct that a person makes unavoidable based on their own immediately proximate voluntary acts, for example, driving while drunk, harassing others, or camping or building shelters that interfere with pedestrian or automobile traffic.
Our holding is a limited one. We do not hold that the Eighth Amendment includes a mens rea requirement, or that it prevents the state from criminalizing conduct that is not an unavoidable consequence of being homeless, such as panhandling or obstructing public thoroughfares. Cf. United States v. Black, 116 F.3d 198, 201 (7th Cir.1997) (rejecting convicted pedophile’s Eighth Amendment challenge to his prosecution for receiving, distributing, and possessing child pornography because, inter alia, defendant “did not show that [the] charged conduct was involuntary or uncontrollable”).
*1138 We are not confronted here with a facial challenge to a statute, cf. Roulette v. City of Seattle, 97 F.3d 300, 302 (9th Cir.1996) (rejecting a facial challenge to a municipal ordinance that prohibited sitting or lying on public sidewalks); Tobe v. City of Santa Ana, 9 Cal.4th 1069, 1080, 40 Cal.Rptr.2d 402, 892 P.2d 1145 (1995) (finding a municipal ordinance that banned camping in designated public areas to be facially valid); nor a statute that criminalizes public drunkenness or camping, cf. Joyce v. City and County of San Francisco, 846 F.Supp. 843, 846 (N.D.Cal.1994) (program at issue targeted public drunkenness and camping in public parks); or sitting, lying, or sleeping only at certain times or in certain places within the city. And we are not called upon to decide the constitutionality of punishment when there are beds available for the homeless in shelters. Cf. Joel v. City of Orlando, 232 F.3d 1353, 1357 (11th Cir.2000) (affirming summary judgment for the City where “[t]he shelter has never reached its maximum capacity and no individual has been turned away for lack of space or for inability to pay the one dollar fee”).
We hold only that, just as the Eighth Amendment prohibits the infliction of criminal punishment on an individual for being a drug addict, Robinson v. California, 370 U.S. 660, 667, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962); or for involuntary public drunkenness that is an unavoidable consequence of being a chronic alcoholic without a home, Powell, 392 U.S. at 551, 88 S.Ct. 2145 (White, J., concurring in the judgment); id. at 568 n. 31, 88 S.Ct. 2145 (Fortas, J., dissenting); the Eighth Amendment prohibits the City from punishing involuntary sitting, lying, or sleeping on public sidewalks that is an unavoidable consequence of being human and homeless without shelter in the City of Los Angeles.
We do not suggest that Los Angeles adopt any particular social policy, plan, or law to care for the homeless. See Johnson v. City of Dallas, 860 F.Supp. 344, 350-51 (N.D.Tex.1994), rev’d on standing grounds, 61 F.3d 442 (5th Cir.1995). We do not desire to encroach on the legislative and executive functions reserved to the City Council and the Mayor of Los Angeles. There is obviously a “homeless problem” in the City of Los Angeles, which the City is free to address in any way that it sees fit, consistent with the constitutional principles we have articulated. See id. By our decision, we in no way dictate to the City that it must provide sufficient shelter for the homeless, or allow anyone who wishes to sit, lie, or sleep on the streets of Los Angeles at any time and at any place within the City. All we hold is that, so long as there is a greater number of homeless individuals in Los Angeles than the number of available beds, the City may not enforce section 41.18(d) at all times and places throughout the City against homeless individuals for involuntarily sitting, lying, and sleeping in public. Appellants are entitled at a minimum to a narrowly tailored injunction against the City’s enforcement of section 41.18(d) at certain times and/or places.
We reverse the award of summary judgment to the City, grant summary judgment to Appellants, and remand to the district court for a determination of injunctive relief consistent with this opinion.
REVERSED AND REMANDED.

. It is unclear on what basis the dissent asserts that this report "does not indicate that Los Angeles was among the cities surveyed,” or that it "is the only study in the record.” Throughout the report, including on page 96 and on the final page, Los Angeles is named as one of the twenty-five surveyed cities. The record includes more than a half dozen public reports Appellants filed in support of their motion for summary judgment, without objection.

. During oral argument, the attorney for the City asserted that L.A.P.D. officers leaflet Skid Row the day before making their section 41.18(d) sweeps to warn the homeless, and do not cite or arrest people for violating section 41.18(d) unless there are open beds in homeless shelters at the time of the violations. No evidence in the record supports these assertions.

. As a practical matter, it is questionable how homeless individuals would either know that they could assert a necessity defense or have the wherewithal to hire an attorney who might so advise them, particularly after being arrested, serving jail time, and losing their belongings. The argument that at trial a homeless individual would have recourse to a necessity defense so as to avoid conviction begs the question why the City arrests homeless individuals during nighttime in the first place, other than out of indifference or meanness. As the Los Angeles City Attorney has publicly stated, " 'The tragedy of homelessness is compounded by indifference.’ ” Anat Rubin, "Jobs, Not Jails,” Skid Row Protesters Shout at Politicos, L.A. Daily J\, Feb. 22, 2006, at 1 (quoting the City Attorney). Yet the National Coalition for the Homeless recently named Los Angeles one of the twenty "meanest” cities in the United States in its treatment of the homeless. Nat’l Coal, for the Homeless & Nat’l Law Ctr. on Homelessness & Poverty, A Dream Denied: The Criminalization of Homelessness in U.S. Cities 10, 40-41 (2006).

. The City belatedly objects to the dispositions attached to the Barger and Purrie declarations on foundational grounds. Having failed to assert its objections before the district court, the City has waived its objections as to the authenticity of the dispositions. See, e.g., Drummond ex rel. Dmmmond v. City of Anaheim, 343 F.3d 1052, 1058 n. 5 (9th Cir.2003).
In addition, the City and the dissent claim Appellants lack standing because they have failed to demonstrate that shelter was unavailable on the nights they were arrested or cited for violating section 41.18(d), and therefore cannot establish that they were punished for involuntary conduct. Because Appellants seek only prospective injunctive relief, standing depends on the likelihood of future injury, not the existence of past injury. Nevertheless, undisputed evidence in the record, including several reports directly authored or commissioned by City agencies or task forces, shows that there is a chronic and severe gap between the number of homeless individuals and the number of available beds in Los Angeles. E.g., L.A. Homeless Servs. Auth., supra, at 2-14 (in the County as a whole, there are almost 50,000 more homeless people than available beds). This evidence supports the reasonable inference that shelter is unavailable for thousands of homeless individuals in Los Angeles on any given night, including on the nights in question. Moreover, each of the declarations either expressly state that the declarant was unable to obtain shelter at the time they were cited or arrested, or provide sufficient facts from which a reasonable inference can be drawn that they were unable to do so.

. It would appear that at least Purrie and Barger raise a triable issue that they were convicted of violating LAMC § 41.18(d) and fear conviction in the future. While this might satisfy the Fifth Circuit’s Johnson test, it does not necessarily save their standing to the extent they challenge the ordinance based on being convicted for the involuntary "condition” of being on the streets without avail *1142 able shelter. This is because there is no evidence that shelter was unavailable when they committed the underlying offense of sitting, sleeping or lying on City sidewalks.